UNITED STATES BREWERS
ASSOCIATIÓN, INC., et al.

v.

John F. HEALY, et al.

Civ. No. H–81–836.

United States District Court,
D. Connecticut.

Feb. 16, 1982.

Henry L. Fisher, Lieberman & Segaloff,
New Haven, Conn., William H. Allen, Rich-

ard A. Friedman, H. Thomas Austern, Sarah E. Burns, Covington & Burling, Washington, D. C., Richard M. Reynolds, Ralph C. Dixon, Day, Berry & Howard, Hartford, Conn., William H. Mulligan, Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiffs.

Carl Ajello, Atty. Gen., State of Conn., Robert Langer, John R. Lacey, Asst. Attys. Gen., Hartford, Conn., Richard M. Sheridan, Robert Vacchelli, Asst. Attys. Gen., Newington, Conn., for defendants.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

BLUMENFELD, Senior District Judge.

■ Plaintiff, United States Brewers Association,[1] brings this action challenging the constitutionality of sections 30–63a(b),[2] 30–63b(b)[3] and 30–63c(b)[4] of the Connecticut Liquor Control Act, Connecticut General Statutes, Title 30, Ch. 545, as amended by Public Act No. 81–294, June 8, 1981 (hereafter referred to as the "beer price affirmation act," "the statute," or "the Act"). Plaintiff is a non-profit corporation representing brewers and importers of beer, many of whom sell beer in Connecticut and the three bordering states, New York, Massachusetts, and Rhode Island. Plaintiffs request a declaratory judgment holding these sections of the price affirmation statute unconstitutional as applied to them on the grounds that the Act violates the Supremacy Clause (art. VI, cl. 2) and the Commerce Clause (art. I, § 8, cl. 3) of the United States Constitution.[5] In addition, plaintiffs seek a permanent injunction restraining the

1. In addition to the United States Brewers Association (USBA), there are several other plaintiffs, all brewers and importers of beer. Only Anheuser-Busch, Inc. has appeared separately and filed its own motions and briefs. All parties join in USBA's motion for summary judgment, and for convenience I will refer to them collectively as plaintiff(s) or brewers.

2. Liquor Control Act (LCA) Conn.Gen.Stat. § 30–63a(b), as added by Section 11 of Public Act No. 81–294, provides as follows:

No holder of any manufacturer or out-of-state shipper's permit shall ship, transport or deliver within this state, or sell or offer for sale to a wholesaler permittee any brand of beer as defined in Section 30–1, at a bottle, can or case price higher than the lowest price at which such item is then being sold or offered for sale or shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state.

3. LCA § 30–63b(b), as added by Section 12 of Public Act No. 81–294, provides as follows:

At the time of posting of the bottle, can and case price required by Section 30–63, as amended by Section 10 of this act, every holder of a manufacturer or out-of-state shipper's permit, or the authorized representative of a manufacturer, shall file with the Department of Liquor Control a written affirmation under oath by the manufacturer or out-of-state shipper of each brand of beer posted certifying that the bottle, can or case price to the wholesaler permittees during the period of the posting will be no higher than the lowest price at which each such item of beer is or will be sold, offered for sale, shipped, transported or delivered by such manufacturer or out-of-state shipper to any wholesaler in any state bordering this state, at any time during the calendar month covered by such posting.

4. LCA § 30–63c(b), as amended by Section 13 of Public Act No. 81–294, provides as follows:

In determining the lowest price for which any item of beer is or was sold, offered for sale, shipped, transported or delivered during such posted period by any manufacturer or out-of-state shipper to a wholesaler in any state bordering this state, appropriate reductions will be made for all discounts, rebates, free goods, allowances and other inducements of any kind whatsoever, including depletion and floor-stock allowances, offered or given to any such wholesaler; provided that differentials in price which make only due allowance for differences in state taxes and fees and for the actual cost of delivery are permissible.... A manufacturer or out-of-state shipper of beer shall offer to Connecticut wholesalers all of the sizes, approved by the Division of Liquor Control, of his brand which he offers to any wholesaler in any state bordering this state.

5. Plaintiffs also present claims under the Due Process Clause and the twenty-first amendment. These secondary claims will be dealt with later in this opinion. *See infra* at 1321, 1330–1331.

defendants, the members of the Department of Liquor Control of the State of Connecticut, from enforcing the provisions of the statute.[6] Jurisdiction in this court is based on 28 U.S.C. § 1331(a) which provides for federal court jurisdiction over civil actions arising under the laws or Constitution of the United States, and 28 U.S.C. § 1337 which confers jurisdiction over any civil action arising under any act of Congress regulating commerce.

The plaintiffs have submitted affidavits from seven brewers and six importers outlining the structure of the beer market in general and in the four-state market in particular. The affidavits outline the possible effects of the beer price affirmation statute on the brewers' business, and indicate the variety of responses open to the brewers. Plaintiffs have also submitted an affidavit of Dr. Bruce Owen, an economist, supporting their position that the statute will have anticompetitive effects on the beer industry in the four-state area. On November 10, 1981, a hearing on plaintiffs' motion for preliminary injunction was held. Subsequently, in a ruling dated November 25, 1981, the court denied the motion for a temporary injunction, finding that plaintiffs had failed to demonstrate either irreparable injury or a likelihood of success on the merits. *United States Brewers Association v. Healy*, Civil No. H–81–836, Ruling on Plaintiffs' Motion for Preliminary Injunction (D.Conn. Nov. 25, 1981). The brewers then moved for summary judgment in an effort to obtain an expedited resolution of this matter. The defendants responded with a cross-motion for summary judgment, supported by the affidavits of Charles W. Kasmer, a defendant and Secretary of the Department of Liquor Control, and Dr. Paul Weiner, an economist. In addition, the defendants submitted a statement of material facts pursuant to local rule 9(d) contesting some of the "material

facts not in dispute" contained in plaintiffs' 9(d) statement. The parties waived oral argument on these motions in order to hasten the court's decision.

### I. *Summary Judgment Principles*

The requirements for granting summary judgment are well established. There must be "no genuine issue as to any material fact," and a party must be "entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)." *American International Group, Inc. v. London American International Corp.*, [664 F.2d 348] (2d Cir. Nov. 13, 1981).

*Schwabenbauer v. Board of Education*, 667 F.2d 305, 313 (2d Cir. 1981). "A material fact is one which may affect the outcome of the litigation," *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 282 (9th Cir. 1979) (citation omitted) or which "constitutes a legal defense to an action." *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 892 (5th Cir. 1980) (citation omitted).

Not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy as to the inferences to be drawn from them. *E.g., Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir. 1967). In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 [82 S.Ct. 993, 994, 8 L.Ed.2d 176] (1962) (per curiam); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980). . . . [T]he fact that both sides have moved for summary judgment does

---

**6.** The statute took effect on January 1, 1982, but the contested provisions have just become applicable, since the first price posting under the Act was not until January 13, 1982, for

prices effective on February 1, 1982. See letter of John F. Healy, Chairman, Liquor Control Commission, dated November 23, 1981.

not mean that the court must grant judgment as a matter of law for one side or the other. *E.g., Home Insurance Co. v. Aetna Casualty & Surety Co.*, 528 F.2d 1388, 1390 (2d Cir. 1976) ("The fact that both sides . . . sought summary judgment does not make it more readily available."); *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975).

*Schwabenbauer*, at 313–314.

■ "[The Court does] not assume that no material facts remain in dispute simply because both parties moved for summary judgment." *Matter of Citizens Loan & Savings Co.*, 621 F.2d 911, 913 (8th Cir. 1980) (citation omitted). Rather, the court must evaluate each party's motion on its own merits to determine if summary disposition is appropriate.

■ "[I]t is well settled [however] that even genuine disputed issues of fact will not preclude summary judgment unless they are material to the legal issues in the case." *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.*, 639 F.2d 386, 392 n.5 (7th Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 102 S.Ct. 144, 70 L.Ed.2d 119 (1981); *accord, British Airways Board v. Boeing Co.*, 585 F.2d 946, 952–53 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979).

Applying these principles to the instant matter, the court concludes that this is an appropriate case for summary judgment. The defendants' objections to certain of the statements alleged to be "material facts not in dispute" in plaintiffs' 9(d) statement do not bar granting summary judgment, because these statements are either not material, or not facts at all. The objections to the brewers' statements relating to the nature of the beer industry are not material to the resolution of the legal issues presented by these motions.[7] The separate 9(d) statement submitted by Anheuser-Busch, Inc. concerns itself solely with the purpose behind the beer price affirmation statute. To the extent that Anheuser-Busch's statements are factual, the defendants' objections are not material.[8] To the extent the 9(d) statement states arguments or conclusions, the court is entitled to disregard them.

The statements of material facts submitted by the parties, along with the supporting affidavits, reveal the following pertinent facts:

1. Connecticut residents cross state borders in significant numbers to purchase beer at lower retail prices.[9]

2. The purpose of the beer price affirmation statute is to lower the price of

---

**7.** An example of this group of immaterial disputed facts is found in paragraph two of defendants' 9(d) statement. Whether or not beer is perishable, and what that term means, have absolutely no bearing on the legal issues in this case. Similarly, the other disputed facts about the price elasticity of beer, the market breakdowns, the nature of competition, etc., are not material.

**8.** The court finds that paragraph one of Anheuser-Busch's 9(d) statement is a material fact not in dispute. Defendants' objection is a linguistic quibble, nothing more. Paragraph two is also material and not disputed, with the exception of the statement "regardless of competitive conditions." As this is not a factual statement, but an argument, the dispute is not material. Paragraph three states that "[a]s a result of these provisions, Connecticut wholesalers will receive a legislatively mandated competitive advantage over competing border state wholesalers and retailers." It continues,

saying that whatever Anheuser-Busch does in response to the statute "will damage the competitive position of bordering state wholesalers and retailers *vis-a-vis* their Connecticut competitors and will result in injury to Anheuser-Busch . . . ." It is reasonably clear that neither of these statements are primarily factual, insofar as they state conclusions and predict future events. Because these parts of paragraph three are not statements of material facts not in dispute, the court will disregard them. The rest of paragraph three is arguably factual but is not material and need not be considered any further.

**9.** Statement by Anheuser-Busch of Material Facts as to Which There is No Genuine Issue to be Tried (A–B's 9(d) statement) ¶ 1; Statement of Material Facts by Defendants John F. Healy, Et Al. (Defendants' 9(d) statement) ¶ 32.

beer to Connecticut consumers [10] thereby increasing the purchase of beer by Connecticut residents within the state, and generating increased tax revenues.[11]

3. There are no breweries in Connecticut.[12]

4. In each of the four relevant states the beer distribution system consists of three tiers as required by state licensing laws: brewers and importers, wholesalers, and retailers.[13]

5. The brewers and importers doing business in the four-state area have the following choices of how to comply with the beer price affirmation statute:[14]

(a) the Connecticut price can be lowered to equal the lowest price in a bordering state;

(b) lower prices in border states can be raised to the Connecticut level;

(c) the brand or brands that sell at lower prices in the border states can be withdrawn from Connecticut;

(d) the brand or brands that sell for lower prices in the border states can be withdrawn from the markets where the price is lower than the Connecticut price.

The court takes judicial notice of the following facts:

1. Connecticut's statutory scheme regulating the liquor industry contains the following provisions:

A. *Price Posting.* All brewers and importers of beer must file with the Department of Liquor Control a schedule of prices that they will charge to Connecticut wholesalers. Conn.Gen.Stat. § 30–63(c), Pub.Act 81–294 § 10(c). These "posted prices" apply to all sales to Connecticut wholesalers. They are subject to changes that can be filed on or before the thirteenth day of any month to become effective on the first day of the next month. The posted prices are per bottle, can, or case prices for every brand of beer in every size bottle or can without distinction based on the way the bottles or cans are packaged or even whether they are further packaged. Connecticut wholesalers must also post their prices. Posted prices cannot be changed between monthly posting dates.

B. *Discounts.* Neither brewers nor wholesalers may offer discounts or other inducements of any kind to their customers. Conn.Gen.Stat. § 30–63(b), Pub.Act 81–294 § 10(b). However, the Department of Liquor Control allows beer price alterations by brewers and importers known in the industry as a "post-off." A "post-off" is the functional equivalent of a temporary discount, designed to spark sales.[15] The posted price in Connecticut is the governing price on all sales of beer regardless of quantity or other circumstances of a particular sale.

C. *Price Differentiation Among Customers.* Neither brewers nor wholesalers may differentiate among their customers in respect of price or other terms of trade. Conn.Gen.Stat. § 30–63(b), Pub.Act 81–294 § 10(b).

D. *Sales Below Cost.* Sales below cost by brewers, importers, and wholesalers are prohibited. Conn.Gen.Stat. § 30–63(b), Pub.Act 81–294 § 17.

E. *Resale Prices.* Suggested consumer resale price schedules must be filed; compliance by retailers is not mandatory. Conn.Gen.Stat. § 30–64, Pub.Act 81–294 § 15.

---

10. Defendants' 9(d) statement ¶ 33.

11. A–B's 9(d) statement ¶ 1; Defendants' 9(d) statement ¶¶ 12, 33.

12. United States Brewers Association Statement of Material Facts Not in Dispute (USBA's 9(d) statement) ¶ 3.

13. USBA's 9(d) statement ¶ 10.

14. USBA's 9(d) statement ¶ 23.

15. Affidavit of Charles W. Kasmer (Kasmer Aff.) ¶¶ 4–6.

F. *Minimum Markups.* Minimum markups for wholesale and retail beer prices which were required by law have been repealed by Public Act No 81–294 § 21, effective January 1, 1982.[16]

G. *Exclusive Territories.* Wholesalers are prohibited from selling to retailers located outside their designated territories.[17] However, a wholesaler's territory is determined by the brewer or importer under Conn.Gen.Stat. §§ 30–17 and 30–63, and may be as small or large as the brewer or importer chooses.[18]

H. *Bottle Bill.* The Connecticut bottle and can return bill requires that all beer (and soft drink) bottles and cans be redeemable for at least five cents, and also requires that brewers and importers put special labels on cans and bottles and special non-de-tachable tabs on cans. Conn.Gen.Stat. §§ 22a–78, 22a–88.[19]

2. The price affirmation statute requires the monthly posting of prices for beer by brewers and importers, and adherence to those prices during the month governed by the posting.[20] The relevant portions of the Connecticut statute may be summarized as follows:

A. Each brewer selling in Connecticut must affirm that its prices to Connecticut wholesalers are no higher than the lowest price it sells or offers to sell, during the month following, to any wholesaler in the three bordering states; sales in Connecticut at higher than this lowest price are prohibited.[21]

B. "Lowest price" is calculated net of all discounts, allowances and inducements of

**16.** The beer price affirmation provisions are only one part of a larger statute which repealed the legally required minimum markups on alcoholic beverages. The title of the Act, "An Act Concerning the Elimination of Minimum Markups on Liquor Sales," indicates that repeal of minimum markups was the primary concern of the legislature. (See Remarks of Rep. Carragher, House (H)–68.) The stated purpose of the repeal was to benefit consumers by lowering prices of alcoholic beverages, thereby generating increased tax revenues for the state through increased sales. (See Remarks Rep. Carragher, H–70, 224–25; Rep. Moynihan, H–119; Sen. Schneller, Senate (S)–46.) Connecticut, due to its extensive regulations maintaining high prices and otherwise restricting free competition, has more retail stores per capita than any other state in the Union. (See Remarks Sen. Skelley, S–28; Sen. Johnson, S–35.) Many of these are so-called "Mom and Pop" stores, whose economic survival was thought to be dependent on the minimum markup laws. (See Remarks Sen. Johnson, S–36; Sen. Mustone, S–22, 24.) The legislature, in repealing minimum markups, was concerned with cushioning the impact of free competition on the small retail stores. (See Remarks Sen. Ballen, S–109–110; Rep. Carragher, H–224–227.) To this end, the legislation included several measures designed to·protect small retailers from competition *within* the state. These so-called "safeguards" include: (1) a five-year moratorium on the issuance of new retail permits (Rep. Carragher, H–70, 219, 225; Sen. Mustone, S–18; Sen. Schneller, S–44–45); (2) after the expiration of the five-year moratorium, new retail permits may be issued only at the rate of one per 2,500 people in population growth (Sen. Mustone, S–19; Sen. Schneller, S–45; Rep. Carragher, H–219, 225); (3) abolition of one day permits for organizations, thereby requiring social groups to make quantity purchases from retailers (Sen. Mustone, S–19; Rep. Carragher, H–225); (4) retailers may purchase from wholesalers in another territory if the product is unavailable from their distributor or if the price is lower elsewhere (Sen. Mustone, S–19; Rep. Carragher, H–220–221, 226); (5) wholesalers cannot price differentiate among retailers (Rep. Carragher, H–225); (6) retailers cannot price below cost (Rep. Carragher, H–225); (7) no quantity discounts may be offered by brewers or wholesalers (Sen. Mustone, S–21; Rep. Carragher, H–226); (8) no person can own or have an interest in more than two retail liquor stores (Sen. Schneller, S–45; Rep. Carragher, H–220, 225–26); and (9) a three-day period in which wholesalers may revise their posted prices *downward* to compete with the lowest prices posted (Sen. Mustone, S–20; Rep. Carragher, H–220, 226).

**17.** Department of Liquor Control Reg. § 30–6–37.

**18.** Kasmer Aff. ¶ 8.

**19.** USBA's 9(d) statement ¶ 20; Defendants' 9(d) statement ¶ 9.

**20.** Conn.Gen.Stat. § 30–63(c), Pub.Act 81–294 § 10(c).

**21.** Conn.Gen.Stat. §§ 30–63a(b), 63b(b), Pub.Act 81–294 §§ 11, 12.

any kind offered to any bordering state wholesaler; due allowance can be made for differentials attributable to differences in state taxes and the actual cost of delivery.[22]

C. No allowance is made for different package configurations (*e.g.* a case of six-packs versus a case of loose cans or bottles); in addition, for any brand a brewer offers for sale in Connecticut, it must offer to Connecticut wholesalers all the sizes of that brand offered to wholesalers in the three bordering states.[23]

## II. *Beer Marketing in the Four-State Area*

Plaintiffs claim that the price affirmation statute impermissibly burdens interstate commerce insofar as it disrupts their business practices within the four-state area. To better understand the nature of plaintiffs' argument, it is necessary to provide some background on the present marketing practices of the brewers and importers, and the regulatory schemes of the bordering states.

All four states require licenses for those who market beer at each of the three levels involved; brewers, distributors and retailers. The net effect of this scheme is to entirely preclude sales by wholesalers in one state to retailers in another. At this point the uniformity ends. Massachusetts is similar to Connecticut in that it does have a price posting requirement applicable to brewers and importers,[24] although there is no requirement that the posted price be equal to the lowest price charged for the same item in some other place. Massachusetts, like Connecticut, also prohibits brewers or wholesalers from differentiating among their customers in respect of price or other terms of trade,[25] prohibits sales below cost by brewers, importers, and wholesalers,[26] and requires that consumer resale price schedules be filed, although compliance by retailers is not mandatory in either state.[27] And last, Massachusetts, like Connecticut, has recently passed a bottle bill which will require that cans and bottles be redeemable.[28]

In New York and Rhode Island brewers and importers, unfettered by extensive regulation, can and do offer a range of price discounts to wholesalers for a variety of reasons. Discounts are offered for quantity sales, sales to special customers (the so-called home distributors in New York), to encourage advertising by wholesalers, for purposes of test marketing new products, and for promotional purposes.[29]

---

**22.** Conn.Gen.Stat. § 30–63c(b), Pub.Act 81–294 § 13.

**23.** Conn.Gen.Stat. § 30–63c(b), Pub.Act 81–294 § 13.

**24.** *See* Mass.Ann.Laws ch. 138 § 25B, and Conn.Gen.Stat. § 30–63(c), Pub.Act 81–294 § 10(c). No change can be made in the posted price in Massachusetts or Connecticut except where there is a typographical error in the posting. The posted price, whether promotional or not, must continue for a full thirty days. Affidavit of Donnell E. Balmert (Balmert Aff.) C–5, ¶ 11.

**25.** Mass.Ann.Laws ch. 138 § 25A, and Conn. Gen.Stat. § 30–63(b), Pub.Act 81–294 § 10(b).

**26.** 204 Code Mass.Regs. § 2.04, and Conn.Gen. Stat. § 30–68i, Pub.Act 81–294 § 17.

**27.** Mass.Ann.Laws ch. 138 § 25C, and Conn. Gen.Stat. § 30–64, Pub.Act 81–294 § 15.

**28.** *See Boston Globe*, Tues. Nov. 17, 1981, pp. 1, 22. The Massachusetts statute takes effect on January 17, 1983. In addition to Massachusetts and Connecticut, five other states, Maine, Vermont, Oregon, Michigan and Iowa have bottle bills.

**29.** Price promotions in New York must last at least six months. (Balmert Aff. C–6, ¶ 13.) The functional equivalent of price promotions can be achieved in Connecticut through the use of the "post-off." (Kasmer Aff. ¶¶ 4–6). Discounts may also be offered for particular package configurations, *e.g.* cases consisting of loose or individual bottles and cans. In Connecticut, posted prices must be per case, bottle or can and prices may not vary according to how the bottles or cans are packaged. Massachusetts does allow price promotions. (Affidavit of Michael J. LaMonica (LaMonica Aff.) A–10, ¶ 27.)

At present, the brewers' pricing policies in New York and Rhode Island are characterized by a good deal of flexibility and variability. The New York City market is the most highly competitive,[30] and accordingly, prices there are often the lowest in the four-state region.[31] Prices charged by brewers and importers to Connecticut wholesalers are neither the highest nor the lowest in the four-state area.[32] Retail prices in Connecticut, however, are generally higher than those in the bordering states.[33]

The beer price affirmation statute would force some changes in the current marketing practices employed by the brewers and importers. The statute requires that the brewers sell to Connecticut wholesalers at the lowest price the same item is being sold anywhere in the four-state region. If a particular brewer's lowest price in the region for a given item is being offered to a home-distributor[34] in New York City, the Connecticut statute would require that brewer to offer the item for the same price for the entire Connecticut market. The brewers and importers argue that competitive conditions do not justify selling at such low prices in Connecticut, and claim that by doing so they will suffer serious economic losses. Alternatively, the plaintiffs argue that if they raise their prices in the competitive New York City area they will be priced out of the market and will lose a significant portion of their business.[35]

In addition to its effect on prices, plaintiffs maintain that the statute will limit competition in the four-state area. Their argument here is that the statute will effectively preclude the brewers from lowering prices elsewhere once the price is posted in Connecticut. This loss of price flexibility will disrupt the current practice of offering short-term price discounts to wholesalers. In short, the plaintiffs argue, the Act will cause the "dislocation of marketing choices or the entire loss of markets in which investments have been made."[36]

### III. *Plaintiffs' Contentions*

Plaintiffs' Commerce Clause argument is directed at both the purpose and effect of the Act. They argue, relying on comments from the legislative debates on the statute, that the legislative intent was to "protect Connecticut wholesalers and retailers from out-of-state competition."[37] Insofar as the purpose and effect of the price affirmation statute is to benefit local interests by discriminating against out-of-state concerns, it is "protectionist" legislation, constituting a *per se* violation of the Commerce Clause. *See Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978).

The other prong of the Commerce Clause argument focuses only on the *effect* of the statute. Thus, even if the statute is even-handed on its face, it may not stand if the burden it imposes on commerce is clearly excessive in relation to legitimate local interests. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The brewers argue that the

---

**30.** LaMonica Aff. A–5, ¶ 14; Balmert Aff. C–7, ¶ 16; Affidavit of John D. Reifenrath D–4, ¶ 15.

**31.** The upstate New York region is also highly competitive, due to the presence of Genessee, a popular regional beer. Narragansett provides similar intense local competition in Rhode Island. LaMonica Aff. A–7, ¶ 18; Affidavit of Dan Daly E–6, ¶ 12.

**32.** USBA's 9(d) statement ¶ 22.

**33.** USBA's 9(d) statement ¶ 21.

**34.** Home distributors or vendors appear to be unique to New York. These home vendors apparently control large portions of the New York City market, dealing in large quantity sales to both wholesale and retail customers.

They currently receive significant discounts from the brewers, which are passed along to quantity purchasers. *See* Affidavits of Dan Daly E–5, ¶ 10; Ralph Walder B–8, ¶ 13; and John Reifenrath D–5, ¶ 16.

**35.** A third alternative is to withdraw from the Connecticut market. Obviously this might have economic consequences for the brewers which they hope to avoid.

**36.** USBA's 9(d) statement ¶ 24.

**37.** Anheuser-Busch's Memorandum in Support of its Motion for Summary Judgment (A–B's Brief on Sum. J.) at 3.

restrictions on price flexibility and the disruptive effects on their market practices are substantial burdens on interstate commerce, not justified by any legitimate state interest.[38] Additionally, plaintiffs argue that to the extent the statute reduces the flow of consumers across state lines to purchase beer it imposes an impermissible burden on interstate commerce.

The plaintiffs' second major contention is that the statute violates the Supremacy Clause because it compels a violation of the Sherman Antitrust Act, 15 U.S.C. § 1. The brewers argue that the Connecticut law requires them to "fix minimum prices [they] will charge for beer in the states bordering Connecticut and to maintain those minimum prices until they are changed in accordance with Connecticut's monthly price posting requirements." In addition, they argue, the Act "necessitates a common refusal to deal with the competitors of some Connecticut beer wholesalers on terms more favorable than those offered to the Connecticut wholesalers even though more favorable terms would be justified by competitive conditions."[39] The brewers argue that the statute, in combination with the Massachusetts posting requirement, will require the announcement of future maximum prices for Connecticut, also in violation of the Sherman Act. Prices must be posted in Massachusetts on the first day of the month, effective the first day of the month following. These prices must not be lower than the prices posted in Connecticut on the thirteenth of the month, effective the following month. Thus the price posted in Massachusetts becomes, by the interaction of the two statutes, the maximum price which may be posted in Connecticut. These

three effects, the brewers argue, constitute coerced violations of the Sherman Act, which are not protected by the doctrine of state immunity under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

Plaintiffs also advance two secondary arguments in support of their constitutional claims. First, that the price affirmation statute violates the Due Process Clause of the fourteenth amendment by (1) taking the brewers' property without just compensation, and (2) by regulating the beer business in the bordering states. A variation of this latter point is essentially the brewers' second argument: that the statute impermissibly infringes on the twenty-first amendment powers of the bordering states. The court will consider each of these four arguments in turn.

## IV. *Discussion*

### A. *The Commerce Clause*

The starting point in an analysis of the constitutionality of the statute under the Commerce Clause is the twenty-first amendment, the second section of which provides that: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." As the Supreme Court has consistently held, "That Amendment bestowed upon the states broad regulatory power over the liquor traffic within their territories." *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 299, 65 S.Ct. 661, 664, 89 L.Ed. 951 (1945) (footnote omitted). State statutes regulating alcoholic beverages are entitled to a presumption of validity in light of the broad scope of power in this area. *Cali-*

---

**38.** The brewers argue that even if reducing beer prices is a legitimate state goal, the statute is not designed to achieve it, since it does not ensure that the reduction in price to Connecticut wholesalers will be passed along to retailers and consumers.

*See* USBA's Brief in Support of Motion for Preliminary Injunction at 48. If, however, the price reduction is not passed along, then Connecticut consumers will continue to purchase beer out of state, and the benefit to Connecticut retailers and wholesalers will not material-

ize. Only if the prices fall low enough to induce Connecticut consumers to buy within the state can the statute even arguably disadvantage out-of-state businesses. It thus does plaintiffs little good to argue that the statute is ill-designed to achieve the goal which they argue makes it unconstitutional. *See* note 53 *infra*.

**39.** USBA's Memorandum in Support of its Motion for Preliminary Injunction (USBA's Brief on Pre. Inj.) at 25.

*fornia v. LaRue,* 409 U.S. 109, 118–19, 93 S.Ct. 390, 397–398, 34 L.Ed.2d 342 (1972). "[T]he second section of the Twenty-first Amendment [however] has not operated totally to repeal the Commerce Clause in the area of the regulation of traffic in liquor." *Seagram & Sons v. Hostetter,* 384 U.S. 35, 42, 86 S.Ct. 1254, 1259, 16 L.Ed.2d 336 (1966).

The general principles of the Commerce Clause were restated recently in *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980):

> The Commerce Clause grants to Congress the power "[t]o regulate Commerce ... among the several States." U.S.Const., Art. 1, § 8, cl. 3. Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has recognized that it also limits the power of the States to erect barriers against interstate trade. See, *e.g., Hughes v. Oklahoma,* 441 U.S. 322, 326 [99 S.Ct. 1727, 1731, 60 L.Ed.2d 250] (1979); *Philadelphia v. New Jersey,* 437 U.S. 617, 623 [98 S.Ct. 2531, 2535, 57 L.Ed.2d 475] (1978); *H. P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 534–538 [69 S.Ct. 657, 663–665, 93 L.Ed. 865] (1949); *Cooley v. Board of Wardens,* 12 How. 299 [13 L.Ed. 996] (1852). This limitation upon state power, of course, is by no means absolute. In the absence of conflicting federal legislation, the States retain authority under their general police powers to regulate matters of "legitimate local concern," even though interstate commerce may be affected. See, *e.g., Raymond Motor Transportation, Inc. v. Rice,* 434 U.S. 429, 440 [98 S.Ct. 787, 793, 54 L.Ed.2d 664] (1978); *Great A & P Tea Co. v. Cottrell,* 424 U.S. 366, 371 [96 S.Ct. 923, 927, 47 L.Ed.2d 55] (1976). Where such legitimate local interests are implicated, defining the appropriate scope for state regulation is often a matter of "delicate adjustment." *Ibid.,* quoting *H. P. Hood & Sons, Inc. v. Du Mond,* 336 U.S., at 553 [69 S.Ct., at 679] (Black, J., dissenting). Yet even in regulating to protect local interests, the States generally must act in a manner consistent with the "ultimate ... principle that one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527 [55 S.Ct. 497, 502, 79 L.Ed. 1032] (1935). However important the state interest at hand, "it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently." *Philadelphia v. New Jersey,* 437 U.S., at 626–627 [98 S.Ct., at 2537].

Over the years, the Court has used a variety of formulations for the Commerce Clause limitation upon the States, but it consistently has distinguished between outright protectionism and more indirect burdens on the free flow of trade. The Court has observed that "where simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected." *Id.,* at 624 [98 S.Ct., at 2535]. In contrast, legislation that visits its effects equally upon both interstate and local business may survive constitutional scrutiny if it is narrowly drawn. The Court stated in *Pike v. Bruch Church, Inc.,* 397 U.S. 137 [90 S.Ct. 844, 25 L.Ed.2d 174] (1970):

> "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.,* at 142 [90 S.Ct., at 847].

See also *Hughes v. Oklahoma,* 441 U.S., at 336 [99 S.Ct., at 1736]; *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 353 [97 S.Ct. 2434, 2446, 53 L.Ed.2d 383] (1977); *Great A & P Tea Co. v. Cottrell,* 424 U.S., at 371–372 [96 S.Ct.,

at 927–928]; *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443 [80 S.Ct. 813, 815, 4 L.Ed.2d 852] (1960). The principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects. See *Hughes v. Oklahoma,* 441 U.S., at 336 [99 S.Ct., at 1736]; *Best & Co. v. Maxwell,* 311 U.S. 454, 455–456 [61 S.Ct. 334, 335, 85 L.Ed. 275] (1940).

*Id.* at 35–37, 100 S.Ct. at 2015–2016.

### 1. *"Protectionist" Legislation*

#### a. Discriminatory Purpose

Plaintiffs argue that the purpose of the price affirmation statute was to protect local businesses from competition with their out-of-state counterparts.[40] There is nothing in the record, however, to support this contention.[41] As mentioned above, there are no brewers or importers in Connecticut, so the statute could not possibly benefit local brewers. The statute mandates only that Connecticut wholesalers be treated as well as out-of-state wholesalers with respect to price. The legislative intent to secure "fairer" or "more equal" competition can hardly be characterized as "protectionist" within the meaning of the Commerce Clause. Because neither the statute nor the legislative debates reveal an avowed purpose to discriminate against out-of-state businesses, the statute cannot be invalidated on the basis of its purpose alone.[42]

**40.** A–B's Brief on Sum. J. at 3.

**41.** The brewers point to several statements in the legislative debates to support their contention that the statute has a discriminatory purpose. The isolated comments of a few individuals, however, cannot fairly be ascribed to the legislature as a whole. The statements were not those of the sponsors of the bill, nor were they in any way endorsed by the other members. See note 16, *supra,* for a more complete discussion of the legislative debates.

**42.** While the Supreme Court has indicated that "economic protectionism" may be shown by "proof of either discriminatory effect, see *Philadelphia v. New Jersey,* 437 U.S. 617 [98 S.Ct. 2531, 57 L.Ed.2d 475] (1978) or of discriminatory purpose, see *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 352–353 [97 S.Ct. 2434, 2446–2447, 53 L.Ed.2d 383] (1977)," *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 101 S.Ct. 715, 727 n.15, 66 L.Ed.2d 659, it is hard to find a case where purpose alone has invalidated a statute. The citation to *Hunt v. Washington Apple* in support of the proposition that discriminatory purpose *alone* is sufficient for a finding that a state law is "protectionist" appears to be incorrect. In *Hunt,* the Court stated that

> we need not ascribe an economic protection motive to the North Carolina legislature to resolve this case; we conclude that the challenged statute cannot stand insofar as it prohibits the display of Washington State grades even if enacted for the declared purpose of protecting consumers from deception and fraud in the market place.

*Id.* 432 U.S. at 352–53, 97 S.Ct. at 2446. It is reasonably clear from this quotation that *Hunt* did not involve a finding of discriminatory *purpose,* but rather rested on the existence of a discriminatory *effect. See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. at 351–52, 97 S.Ct., at 2445–2446. As the Court has recognized, it is a "rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." *Dean Milk Co. v. Madison,* 340 U.S. 349, 354, 71 S.Ct. 295, 298, 95 L.Ed. 329 (1951). Because states almost always can, and do, advance legitimate reasons to justify a particular statute, the Court, when considering the *purpose* of a challenged statute, will not be bound by " '[t]he name, description or characterization given it by the legislature or the Courts of the State,' but will determine for itself the practical *impact* of the law." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979) (emphasis added), quoting *Lacoste v. Louisiana Dept. of Conservation,* 263 U.S. 545, 550 44 S.Ct. 186, 188, 68 L.Ed. 437 (1924). Invariably the Court infers discriminatory *purpose* only when there is a prior finding of discriminatory *impact.* The inquiry in each case requires first, a determination of whether a discriminatory effect exists, and second, an evaluation of the declared state purpose in light of the means chosen to attain it. Only where the discriminatory effect appears to stem primarily from a design to protect local interests and only secondarily from the pursuit of a legitimate state goal, has the Court inferred a "protectionist" purpose. The Court has rarely, if ever, invalidated a statute on the basis of a discriminatory purpose where there was not proof of actual or inevitable discriminatory effects. While the Court would be entitled to invalidate a statute with the avowed purpose of discriminating against interstate commerce on the assumption that it will have the desired effect, the opportunity rarely presents itself. As noted above, states are rarely so bold as to announce their intention to violate the Constitution, and the instant case is no exception to the rule.

### b. Discriminatory Effect

Plaintiffs argue that regardless of its purpose the statute has a discriminatory *effect* on out-of-state *wholesalers* and *retailers*. It is significant that the brewers here are attempting to invalidate the statute not because of its direct effects on them, but because of its indirect effects on third parties. They do not argue that the statute discriminates against out-of-state brewers or importers for the simple reason that there are no Connecticut brewers or importers. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125, 98 S.Ct. 2207, 2213, 57 L.Ed.2d 91 (1978).

The brewers assert that the statute discriminates against out-of-state wholesalers and retailers. It is difficult, however, to conceive of the nature of the alleged discrimination. The statute does not affect any business out-of-state wholesalers or retailers conduct *in* Connecticut, since they are not permitted by law to sell beer within the state. Nor does the statute affect any rights to which out-of-state wholesalers or retailers are entitled. The brewers' argument, based on *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 351–52, 97 S.Ct. 2434, 2445–2446, 53 L.Ed.2d 383 (1977), that the statute strips out-of-state retailers of a competitive advantage—lower prices—misses the point. Out-of-state wholesalers and retailers are not entitled to receive prices lower than those charged to their Connecticut counterparts. The out-of-state wholesalers and retailers have not, and could not complain that the statute takes from them the advantage of lower prices, when they have no right to those prices in the first place. If Connecticut may constitutionally regulate the prices brewers charge to their wholesalers, then it would seem to follow that the brewers may not complain about the incidental effects on their out-of-state customers when those effects do not implicate constitutional rights. Since it is clear that out-of-state wholesalers and retailers have no right, constitutional or otherwise, to receive lower beer prices from the brewers, there is nothing about which the brewers may complain. I therefore hold that the beer price affirmation statute does not discriminate against out-of-state businesses and does not, in this respect, contravene the Commerce Clause.[43]

### 2. Burden on Interstate Commerce

Concluding that the statute does not have a discriminatory purpose or effect does not end the inquiry under the Commerce Clause. It still remains to be determined (1) whether the statute burdens interstate commerce, (2) whether such burden is incidental to a regulation effectuating a legitimate local public interest, and (3) whether the burden imposed is excessive in relation to putative local benefits. "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

### a. Beer

In the instant case, the first question is whether the beer price affirmation statute burdens interstate commerce in beer.[44] I have already noted that the statute does not discriminate against brewers, but it may nevertheless impermissibly burden the movement of beer in interstate commerce.

---

**43.** In the instant case, the most that can be said of the statute is that it will shift some business from out-of-state retailers to in-state retailers. Recently, however, the Supreme Court indicated that "[a] nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 101 S.Ct. 715, 729, 66 L.Ed.2d 659 (1981). In light of this quotation it is clear that the shifting of business, standing alone, does not render the statute invalid.

**44.** It should be pointed out that Connecticut has had nationwide price affirmation for liquor since 1973. *See* Conn.Gen.Stat. §§ 30–63(a), (b), (c), Pub.Act 73–387.

The plaintiffs argue quite forcefully that the statute's effect on their marketing practices will be so disruptive as to constitute a burden on interstate commerce. They point to several specific aspects of their marketing practices which will have to be altered in order to comply with the Connecticut statute.[45] In addition, plaintiffs argue that the price affirmation statute will have "dislocating effects on competition in the bordering states," constituting a substantial burden on commerce.[46] In short, plaintiffs contend the Connecticut legislation places an impermissible burden on interstate commerce.

The constitutionality of a price affirmation statute was upheld by the Supreme Court in *Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1256, 16 L.Ed.2d 336 (1966), where it considered an attack on a New York statute which required distillers or distributors to sell liquor to New York wholesalers at the lowest price charged for the same item anywhere else in the *nation*.[47] The Court held that

> [t]he mere fact that § 9 [the price affirmation provision] is geared to appellant's pricing policies in other States is not sufficient to invalidate the statute. As part of its regulatory scheme for the sale of liquor, New York may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country. The serious discriminatory effects of § 9 alleged by appellants on their business outside New York are largely matters of conjecture. . . . It will be time enough to assess the alleged extraterritorial effects of § 9 when a case arises that clearly presents them. "The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Osborn v. Ozlin*, 310 U.S. 53, 62 [60 S.Ct. 758, 761, 84 L.Ed. 1074] [ (1940) ].

*Id.* at 43, 86 S.Ct. at 1260 (other citations omitted). The Court's holding, however, was limited by the following language:

> Although it is possible that specific future applications of [the statute] may engender concrete problems of constitutional dimension, it will be time enough to consider any such problems when they arise. We deal here only with the statute on its face. And we hold that, so considered, the legislation is constitutionally valid.

*Id.* at 52, 86 S.Ct. at 1265.

Plaintiffs in the instant case argue that it is distinguishable from *Seagram v. Hostetter* on its facts. That is, they claim that the affidavits in this case present the "concrete problems" which were lacking in *Seagram*, and therefore that the time has arisen to consider them. Plaintiffs assert that the Connecticut statute, even if constitutional on its face, is unconstitutional as applied to them in these circumstances. In addition, the brewers argue that the recent decision in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), implies that the Court has abandoned or modified its analysis in *Seagram* in favor of stricter scrutiny of state laws regulating alcohol, where they conflict with the federal commerce power.

Plaintiffs' attempts to distinguish *Seagram* on a factual or doctrinal basis are not persuasive.[48] Recognizing that *Seagram*

---

**45.** These include limiting the use of quantity discounts, promotional discounts, advertising discounts, test marketing and restricting the plaintiffs' price flexibility.

**46.** USBA's Brief on Pre.Inj. at 37–38.

**47.** The New York affirmation statute was also part of a legislative package which repealed minimum markups. It reflected the perception of the New York legislature that prices charged to New York wholesalers were higher than retail prices elsewhere. *See* 384 U.S. at 39 n.9, 86 S.Ct. at 1258 n.9. For a description of the New York statute see 384 U.S. at 39–41, 86 S.Ct. at 1257–1259.

**48.** The plaintiffs' attempt to relegate *Seagram* to a "different era" of Commerce Clause adjudication is not persuasive. Nothing in *California Liquor Dealers v. Midcal*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) implies that *Seagram* is no longer good law, or that the states' power under the twenty-first amend-

does leave open the possibility of a different result where a stronger factual record of discriminatory effect exists, I do not believe the brewers have presented such a case.[49] As indicated above, the price affirmation statute does not discriminate against any of these brewers. Nor does the fact that the Connecticut statute regulates beer and not liquor suffice to distinguish this case from *Seagram*, regardless of the differences in the products or the way they are marketed. The plaintiffs' attempt to distinguish the instant case on the basis of a forbidden purpose is, in light of the discussion in the preceding section, similarly unavailing. In short, nothing about the "facts"[50] in this case is sufficient to distinguish it from *Seagram v. Hostetter*.

This conclusion is buttressed by the Court's opinion in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). That case involved a Maryland statute which (1) prohibited producers or refiners of gasoline from operating retail service stations within the state and (2) required them to extend "voluntary allowances" (temporary price reductions) to all service stations. *See id.* at 119–20, 98 S.Ct. at 2211. The oil companies, as the brewers here, argued that the statute violated the Commerce Clause by discriminating against and unduly burdening interstate commerce. *Id.* at 125, 98 S.Ct. at 2213. The Court rejected the discrimination claim because there were no local producers or refiners which benefited from the statute. *Id.* In response to the claim that the statute impermissibly burdened interstate commerce, the Court stated as follows:

> The crux of appellants' [Exxon's] claim is that, regardless of whether the State has interfered with the movement of goods in interstate commerce, it has interfered "with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 806 [96 S.Ct. 2488, 2496, 49 L.Ed.2d 220] [(1976)]. . . . *We cannot, however, accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market.* See *Breard v. Alexandria*, 341 U.S. 622 [71 S.Ct. 920, 95 L.Ed. 1233] [(1951)]. As indicated by the Court in *Hughes*, the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.

*Exxon v. Maryland*, 437 U.S. at 127–28, 98 S.Ct. at 2214–2215 (emphasis added).

■ The court views plaintiffs' claims in the instant case as essentially the same as

---

ment is more restricted than it was fifteen years ago. The fact that the Court in *Midcal* began with an analysis of the Sherman Act issue, instead of the twenty-first amendment, is hardly a "telling indication of the shift in the Court's perspective on the accommodation of the Commerce Clause and the Twenty-first Amendment between 1966 when *Seagram* was decided and *Midcal* in 1980." USBA's Brief on Pre. Inj. at 25 n.1. There are any number of good reasons why the Court structured its opinions differently, the most obvious being the fact that they reached opposite conclusions. Whatever the reason for the organization of the opinion in *Midcal*, this court looks to the content of that opinion for guidance. And nothing the Court said in *Midcal* indicates that *Seagram* is no longer good law. *See* 445 U.S. at 106–10, 100 S.Ct. at 943–946.

**49.** The brewers argue that this case presents a factual record which was missing in *Seagram v. Hostetter*. This record consists of the affidavits of brewers and importers outlining their market practices and indicating the options they have and the effects of complying with the affirmation law. In addition, plaintiffs have submitted the affidavit of Dr. Owen, an antitrust expert, stating the likely effects of the statute on competition in the beer industry. The court takes note, however, that the distillers in *Seagram* also submitted affidavits setting forth the difficulties in complying with the law and indicating the terrible consequences it would have on their marketing practices. *See generally* pp. 199–248 in the Supreme Court record. The only difference between this case and *Seagram*, then, is the affidavit of Dr. Owen. Without intimating any view as to the adequacy of Dr. Owen's analysis, the court does not believe his affidavit alone is sufficient to distinguish this case from *Seagram* on its *facts*.

**50.** Of course, the brewers' contentions are not facts in the sense that they describe historical events. The brewers' affidavits only predict what will occur when the statute takes effect.

those raised by the oil companies in *Exxon.* Plaintiffs argue that the statute will result in the "dislocating of the existing beer distribution system," and equate such dislocation with a "substantial adverse impact on commerce."[51] While the beer price affirmation statute may interfere with the "natural functioning of the interstate market" and force changes in the "particular structure or methods of operation" in the beer market, *Exxon v. Maryland* makes it clear that this alone does not constitute an impermissible burden on interstate commerce. *See id.* at 127, 98 S.Ct. at 2214. Even assuming that some of the brewers or importers withdraw from the Connecticut market, as they threaten to do, it does not follow that the statute impermissibly burdens interstate commerce. As the Court indicated in *Exxon v. Maryland,* withdrawal from a particular market is not necessarily a burden on commerce.

> Some refiners may choose to withdraw entirely from the Maryland market, but there is no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers' supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another.

*Id.* at 127, 98 S.Ct. at 2214.

Similarly, in the instant case there is no reason to believe that the withdrawal of some brewers or importers from Connecticut will not be compensated by increased sales by other brewers or importers. Since all beer sold in the state travels in interstate commerce, withdrawal will simply shift business from one interstate supplier to another. This is clearly permissible under the holding in *Exxon v. Maryland.* The basic beer pricing decisions which underlie the brewers' competitive strategies is left to

them, and each may strike the balance it chooses. I therefore hold that the beer price affirmation statute does not place an impermissible burden on the movement of beer in interstate commerce.[52]

### b. Consumers

■ The brewers' second argument is that the price affirmation statute burdens interstate commerce by restricting the movement of consumers across state lines. Once again the brewers are invoking the rights of third parties. Here, however, the brewers and the consumers on whose behalf they argue have antagonistic interests. It thus becomes necessary to consider whether the brewers may assert claims relating to the constitutional rights of third parties.

■ Plaintiffs do not have standing to raise the consumers' claim that the statute burdens their freedom of movement in interstate commerce. As the Court observed in *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interest of third parties." *Id.* at 499, 95 S.Ct. at 2205. *See also Valley Forge Christian College v. Americans United for Separation of Church and State,* —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d —— (1982); *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977); *Tileston v. Ullman,* 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943) (per curiam). While the Court has allowed plaintiffs to assert the constitutional rights of third parties under "peculiar circumstances," this is not such a case. *See Barrows v. Jackson,* 346 U.S. 249, 256–57, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953). Because plaintiffs' interests are antagonistic to those of the group whose rights they seek to assert, this case is particularly inappropriate for finding an exception to the prudential limitation on standing embodied in *Warth v. Seldin.*

---

**51.** USBA's Brief on Pre. Inj. at 39.

**52.** Because the statute does not burden interstate commerce in beer, it is unnecessary to

employ the "balancing test" of *Pike v. Bruce Church, Inc.,* 397 U.S. at 142, 90 S.Ct. at 847.

Even assuming, however, that plaintiffs do have standing to assert the rights of consumers, the brewers' argument must be rejected. While it is true that the Commerce Clause protects persons from restraints on their movements across state lines, *Service Machine & Shipbuilding Corp. v. Edwards*, 617 F.2d 70, 73 (5th Cir.), *aff'd*, 449 U.S. 913, 101 S.Ct. 310, 66 L.Ed.2d 142 (1980), citing *Edwards v. California*, 314 U.S. 160, 172, 62 S.Ct. 164, 166, 86 L.Ed. 119 (1941), not everything which affects the movement of persons is a burden on interstate commerce. A burden is only that which imposes a restrictive or onerous load upon interstate commerce. The restriction must prevent or limit the exercise of the right to freedom of movement to rise to the level of a Commerce Clause violation. A statute which creates disincentives to travel across state lines by imposing costs on those who wish to do so, would also be characterized as a burden on interstate commerce. *See Service Mach. & Ship. v. Edwards*, 617 F.2d at 76.

The statute in the instant case does not prohibit or otherwise limit the movement of consumers across state lines. Any consumers who wish to continue driving to bordering states to purchase beer may do so. The statute may reduce the incentives for Connecticut consumers to drive out of state for purchases of beer, but it does not involuntarily restrict their movements. That consumers may, of their own free will, decide not to drive to bordering states to purchase beer can hardly be characterized as a burden on interstate commerce.

It is noteworthy that Connecticut consumers have not complained that the statute restricts their freedom of movement in interstate commerce. Nor are they likely to do so, since consumers are the ones who will benefit from lower beer prices in Connecticut. Far from imposing a burden on their movements, the statute relieves consumers of the burden of traveling to bordering states merely to purchase beer. While it may be that the price affirmation statute will reduce the flow of Connecticut consumers across state lines, it does not do so by imposing a burden on interstate commerce. The statute does not act by compulsion in limiting the flow of consumers in interstate commerce. At most it may encourage consumers to *voluntarily* restrict their out-of-state purchases of beer. Such a restriction, self-imposed by consumers acting out of enlightened self-interest, is simply not a burden on interstate commerce.[53]

### B. The Sherman Act

Plaintiffs' second contention, that the price affirmation statute violates the Supremacy Clause by mandating conduct violative of the Sherman Act, does not require extended discussion. This same argument was raised in *Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 and rejected by the Court. "Section 9 [the price affirmation provision] imposes no irresistible economic pressure on the appellants to violate the Sherman Act in order to comply with the requirements of § 9." *Id.* at 45, 86 S.Ct. at 1261.

---

**53.** Even assuming *arguendo* that the statute does burden the movements of consumers in interstate commerce, it still would withstand the balancing test of *Pike v. Bruce Church, Inc.* The state's interest in reducing the price of beer is certainly a legitimate local interest. *Pharmaceutical Society of State of New York v. Lefkowitz*, 586 F.2d 953, 957 (2d Cir. 1978) (potential saving to New York consumers from lower priced generic drugs represents legitimate interest). Nor does it appear that Connecticut can achieve this result without having the same impact on the interstate movement of consumers. Anything which reduces the price differential between retail prices in Connecticut and those in the bordering states will reduce the incentives for out-of-state purchases of beer and thus tend to limit the flow of traffic across state lines. Thus, even if Connecticut adopted the plaintiffs' suggestion and repealed its restrictive regulations, this would not impose a lesser burden on interstate activity if beer prices declined as significantly as they may under affirmation. Since incidental burdens on interstate commerce will only invalidate state legislation where the burdens are "clearly excessive," *Pike v. Bruce Church, Inc.*, 397 U.S. at 142, 90 S.Ct. at 847, any burdens which the statute imposes fall short of this standard. Thus even accepting the brewers' argument on its terms, the statute does not violate the Commerce Clause.

The brewers argue, however, that the New York statute in *Seagram* was significantly different from the Connecticut statute here, inasmuch as the former required only that posted prices for a given item be no higher than the lowest price at which such item was sold in the nation during the *previous* month. The Connecticut statute, on the other hand, requires that posted prices be the lowest at which the item will be sold in the *coming* month. Because it is geared to the future, the Connecticut statute effectively sets minimum prices for the four-state area once the price is posted in Connecticut on the thirteenth of the month. The New York law in *Seagram*, with its referent in the past, had no such effect. This difference, plaintiffs argue, is grounds for distinguishing *Seagram* and finding a Sherman Act violation.

The basic flaw in plaintiffs' argument was pointed out by the court in its ruling on the motion for preliminary injunction. "Absent an agreement among private parties, there cannot be a violation of section one of the Sherman Act, 15 U.S.C. § 1." *United States Brewers Ass'n v. Healy*, slip op. at 13. The plaintiffs argue that the court is in error, relying on *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) for the proposition that no agreement is necessary to constitute a violation of section one. In *Midcal*, the Supreme Court struck down a California statute which required wine producers to fix minimum prices at which wholesalers could resell the wine. *Id.* at 103, 100 S.Ct. at 942. The Court noted that the system "not only permitted vertical control of prices by producers, but also frequently resulted in horizontal price fixing." *Id.* at 101 & n.3, 100 S.Ct. at 941 & n.3. Relying on a long line of cases holding that resale price maintenance illegally restrains trade, *see Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 407, 31 S.Ct. 376, 384, 55 L.Ed. 502 (1911) and finding no immunity under the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Court invalidated the California statute.

Plaintiffs err in their assertion that *Midcal* eliminated the requirement of an agreement for a violation of section one. The Court there indicated that resale price maintenance is the equivalent of an agreement between wholesalers not to compete, *id.*, 445 U.S. at 103, 100 S.Ct. at 942, since the resale restrictions set the prices wholesalers charge retailers. Invariably, the Supreme Court has viewed resale price maintenance as involving an implicit agreement in those instances where an explicit agreement was not shown. In *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960) the Court "held that an illegal combination to fix prices results if a seller suggests resale prices and secures compliance by means in addition to the 'mere announcement of his policy and the simple refusal to deal . . . .' *Id.* at 44 [80 S.Ct. at 512]." *Albrecht v. Herald Co.*, 390 U.S. 145, 149, 88 S.Ct. 869, 871, 19 L.Ed.2d 998 (1968). The other cases cited by the Supreme Court in *Midcal* all involved actual contracts between manufacturers and wholesalers and/or retailers setting the resale prices. *See Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 385, 71 S.Ct. 745, 746, 95 L.Ed. 1035 (1951) (distillers made retailers sign price fixing contracts); *Kiefer-Stewart Co. v. Seagram & Sons, Inc.*, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951) (Seagram refused to sell unless purchaser agreed to maximum resale price); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 95, 40 S.Ct. 251, 252, 64 L.Ed. 471 (1920) (defendant executed uniform contracts with tire manufacturers); *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 394, 31 S.Ct. 376, 379, 55 L.Ed. 502 (1911) (manufacturer adopted two forms of restrictive agreements).

That *Midcal* did not remove the requirement of an agreement can be seen in a close reading of the case itself. The statute there required "wine producers to enter into trade *contracts* with wholesalers, or establish binding resale price *schedules* for wholesalers." *Serlin Wine & Spirit Mer-*

*chants, Inc. v. Healy*; 512 F.Supp. 936, 938 (D.Conn.1981) (emphasis added). The Second Circuit Court of Appeals, in affirming *Serlin v. Healy*, indicated that *Midcal* did involve an agreement. In distinguishing the Connecticut statute there under attack, the court stated: "[u]nlike the California statute in *Midcal*, the Connecticut statutes do not authorize or compel private parties to enter *contracts* or *combinations* to fix prices in violation of § 1 of the Sherman Act." *Morgan v. Division of Liquor Control*, 664 F.2d 353, 355 (2d Cir. Nov.16, 1981) (emphasis added). Because *Midcal* involved either an express or implied agreement, plaintiffs' argument must be rejected.

It is clear then, that

[s]ection 1 of the Sherman Act, which proscribes every "contract, combination, or conspiracy" in restraint of trade, is directed only at joint action. *Ford Motor Co. v. Webster's Auto Sales, Inc.*, 361 F.2d 874, 878 (1st Cir. 1966). It does not prohibit independent business actions and decisions. . . . Fundamental then to any § 1 claim is the finding of an agreement, express or otherwise, between two or more persons.

*Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co.*, 513 F.2d 102, 108–09 (2d Cir. 1975). *See also Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1029 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979). It is also clear that the beer price affirmation statute requires only unilateral action by each brewer and importer. It does not require conduct which the antitrust laws forbid, and does not exert "irresistible economic pressure" on the plaintiffs to violate the Sherman Act. It follows that the statute does not implicate the Supremacy Clause, and, therefore, plaintiffs' argument must be rejected.[54]

**C. *Due Process***

▮ Plaintiffs claim that the price affirmation statute violates the Due Process Clause in two respects. First, that it constitutes a "taking" of property without just compensation, and second, that it regulates the beer business in the bordering states, thus exceeding the jurisdictional limitations on state authority.[55] These arguments need not detain us long.

As the court stated in its previous ruling in this case,

the statute cannot reasonably be characterized as a "taking" of property without due process, because it does not force any brewers to do business in Connecticut at a loss. The mere fact that the plaintiffs' business in Connecticut may decline in value due to the price affirmation statute does not constitute a "taking" of property without just compensation. *See Penn Central Transportation Co. v. New York City*, 438 U.S. 104 [131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631] (1978). And even if some brewers choose to cease doing business in Connecticut, that too would not constitute a taking of property. [*See Exxon v. Maryland*, 437 U.S. 117, 127, 98 S.Ct. 2207, 2214, 57 L.Ed.2d 91 (1978)].

*United States Brewers Ass'n v. Healy*, slip op. at 13–14 n.18.

Plaintiffs' second Due Process argument is equally without merit. As the Court stated in *Seagram v. Hostetter*,

"The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids." *Osborn v. Ozlin*, 310 U.S. 53, 62 (60 S.Ct. 758, 761, 84 L.Ed. 1074) [ (1940) ].

*Id.*, 384 U.S. at 43, 86 S.Ct. at 1260.

This quotation, and the holding in *Seagram* itself, leaves no doubt that Connecti-

---

54. Even assuming that the statute did violate the Sherman Act, it might be protected under the immunity doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). See

*Serlin v. Healy*, 512 F.Supp. 936, 942 (D.Conn. 1981), *aff'd sub nom. Morgan v. Div. of Liquor Control*, at 356 (2d Cir. 1981).

55. USBA's Brief on Pre. Inj. at 51–52.

cut's statute does not violate the Due Process Clause.[56]

### D. *Twenty-first Amendment*

 Plaintiffs' last argument is that the price affirmation statute impermissibly infringes on the twenty-first amendment powers of the bordering states.[57] The short response to this claim is twofold. "First plaintiff[s] ha[ve] no standing to litigate the claims of other states. *Warth v. Seldin*, 422 U.S. 490, 499 [95 S.Ct. 2197, 2205, 45 L.Ed.2d 343] (1975)." *United States Brewers Ass'n v. Healy*, slip op. at 13 n.18. Second, even if plaintiffs did have standing, the claim is without merit, having been resolved by the Court in *Seagram*. It stated:

> As part of its regulatory scheme for the sale of liquor, New York may constitutionally insist that liquor prices to domestic wholesalers and retailers be as low as prices offered elsewhere in the country.

*Id.*, 384 U.S. at 43, 86 S.Ct. at 1260.

Since the Connecticut statute does no more than insist that beer prices to its wholesalers be as low as prices offered to wholesalers in the bordering states, it clearly fits within the constitutionally permissible domain outlined in *Seagram*. Accordingly, plaintiffs' twenty-first amendment claim must also be rejected.

### E. *Conclusion*

In conclusion, Connecticut's beer price affirmation statute does not violate the Commerce Clause since it neither discriminates against interstate commerce nor imposes an impermissible burden upon such commerce. Nor does the statute compel a violation of section one of the Sherman Act, since it requires only unilateral conduct by the brewers and importers.

Accordingly, plaintiffs' motion for summary judgment is denied, and defendants' cross-motion for summary judgment is granted.

SO ORDERED.

---

**56.** Plaintiffs' citation to *Fidelity & Deposit Co. v. Tafoya*, 270 U.S. 426, 46 S.Ct. 331, 70 L.Ed. 664 (1926) is inapposite. There New Mexico imposed sanctions for conduct which occurred *outside* the state. *Id.* at 433–35, 46 S.Ct. at 332. The Connecticut statute, in contrast, does not regulate conduct in another state, since it is the affirmation *in* Connecticut which is the focus of the statute. These cases are thus easily distinguishable.

**57.** USBA's Brief on Pre.Inj. at 53–54.