**Jack R. BATTIPAGLIA and Bacchus Selections Inc., Plaintiff-Appellants,**

v.

**NEW YORK STATE LIQUOR AUTHORITY, Defendant-Appellee,**

**Peerless Importers Inc., Defendant-Intervenor.**

**No. 1381, Docket 84–7168.**

United States Court of Appeals, Second Circuit.

Argued June 11, 1984.

Decided Sept. 21, 1984.

 

Martin P. Mehler, Mehler & Buscemi, New York City, for plaintiffs-appellants.

August L. Fietkau, Asst. Atty. Gen. of N.Y., Robert Abrams, Atty. Gen. of N.Y., Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Richard G. Liskov, Asst. Atty. Gen., New York City, for defendant-appellee.

Lawrence Kill, Anderson, Russell, Kill & Olick, Steven M. Pesner and Daniel N. Sang, New York City, for defendant-intervenor.

Before FRIENDLY, VAN GRAAFEILAND and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

Plaintiff Jack R. Battipaglia is the owner of a licensed liquor store in Long Island City, New York. Plaintiff Bacchus Selections, Inc. is a licensed wholesaler of wines. In this action in the District Court for the Southern District of New York against the New York State Liquor Authority (SLA), they sought a declaration that certain provisions of § 101–b of New York's Alcoholic Beverage Control Law requiring wholesalers to post and maintain schedules of prices and discounts violate § 1 of the Sherman Act and are therefore invalid under the Supremacy Clause. The complaint alleged that the effect of those provisions was "to restrain commerce in the product market of wine in the State of New York by prohibiting wholesalers and retailers from competitive pricing which could benefit the consuming public ..., [t]hat the provisions of the Alcoholic Beverage Control Law ... and the conduct of Defendant Authority constitute a combination and conspiracy in restraint of trade and commerce in wine among the states", and that "by reason of the above-mentioned illegal acts and practices, Defendant Authority has proximately caused injury to plaintiffs in the form of higher prices to them and to members of the general consuming public who purchase wine in the State of New York."

After answer and limited discovery, plaintiffs moved for summary judgment. Judge Owen denied the plaintiffs' motion in an opinion which held that the New York statute did not contravene § 1 of the Sherman Act but that, if it did, conduct thereunder was insulated from attack under the antitrust laws by the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).[1] 583 F.Supp. 8. After the motion was decided, Peerless Importers Inc. (Peerless), another wholesaler of wines, was granted leave to intervene as a defendant in opposition to plaintiffs' motion. Thereafter the Authority and Peerless moved for summary judgment in their favor. The judge granted the motions on the basis of his opinion denying plaintiffs' motion, and this appeal followed.

### DISCUSSION

Section 101–b is entitled "Unlawful discriminations prohibited; filing of schedules; schedule listing fund". We quote § 1 in the margin.[2] Section 2 makes it unlawful for any person who sells liquor or wine to discriminate in price, discounts for time of payment, or on quantity of merchandise sold between one wholesaler and another wholesaler or between one retailer and another retailer purchasing liquor or wine having the same brand or trade name and of like age and quality, or to grant any discount, rebate, free goods, allowance or other inducement of any kind except certain maximum discounts therein specified. Section 3(b), which is the object of plaintiffs' attack, provides that

[n]o brand of liquor or wine shall be sold to or purchased by a retailer unless a schedule ... is filed with the liquor authority, and is then in effect[,]

unless "prior written permission of the authority is granted for good cause shown and for reasons not inconsistent with the purpose of this chapter." N.Y. Alco. Bev. Cont. Law § 101–b(3)(b). Section 4 provides that the schedule required by paragraph 3(b) must be filed before the fifth day of each month and that the prices and discounts would become effective on the first day of the following calendar month and should remain effective for such month. Within ten days after the filing the Authority must make the schedules or a composite available for inspection by licensees. Within three days after the date provided for such inspection, a wholesaler may amend his filed schedule for sales to retailers in order to meet lower competing prices and discounts "provided such amended prices are not lower and discounts are not greater than those to be met." N.Y. Alco. Bev. Cont. Law § 101–b(4).

### I

■■ For some of us who were "present at the creation" of the Twenty-First Amendment, there is an aura of unreality in plaintiffs' assumption that we must examine the validity of New York's Alcoholic Beverage Control Law (ABC Law) just as we would examine the constitutionality of a state statute governing the sale of gasoline. The Twenty-First Amendment was designed to end the "noble experiment" by which the Federal government endeavored to control the drinking habits

1. Judge Owen added that, "Given the foregoing, I need not consider the applicability of the 21st Amendment to these facts."

2. It is the declared policy of the state that it is necessary to regulate and control the manufacture, sale, and distribution within the state of alcoholic beverages for the purpose of fostering and promoting temperance in their consumption and respect for and obedience to the law. In order to eliminate the undue stimulation of sales of alcoholic beverages and the practice of manufacturers and wholesalers in granting discounts, rebates, allowances, free goods, and other inducements to

selected licensees, which contribute to a disorderly distribution of alcoholic beverages, and which are detrimental to the proper regulation of the liquor industry and contrary to the interests of temperance, it is hereby further declared as the policy of the state that the sale of alcoholic beverages should be subjected to certain restrictions, prohibitions and regulations. The necessity for the enactment of the provisions of this section is, therefore, declared as a matter of legislative determination.

See also the preamble quoted in Part IV *infra*.

of all citizens and to place control of alcoholic beverages in the states. Fulfillment of the latter purpose required that, in addition to repealing the Eighteenth Amendment, which was accomplished by § 1, the Amendment should give the states full authority to deal with the subject of intoxicating liquor free from limitations imposed by the Commerce Clause, which had hampered such regulation before the Eighteenth Amendment was adopted. This was accomplished by § 2 of the Twenty-First Amendment which provides:

> The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

In its first encounter with the Amendment, only three years after ratification, the Supreme Court, without dissent, ruled that a state could impose a license fee on the importation of beer that would have been forbidden by the Commerce Clause itself. *State Board of Equalization v. Young's Market Co.*, 299 U.S. 59, 64, 57 S.Ct. 77, 79, 81 L.Ed. 38 (1936). The Court also posed, as a rhetorical question, "Can it be doubted that a state might establish a state monopoly of the manufacture and sale of beer ...," *id.* at 63, 57 S.Ct. at 79, something as antithetical to the Sherman Act as could be imagined.[3] Discussion continued in this vein until *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964). Although Justice Stewart there made the frequently cited declaration quoted in the margin[4], *id.* at 332, 84 S.Ct. at 1298, and also said that a contention that the Twenty-First Amendment had somehow operated to "repeal" the Commerce Clause "would be patently bizarre and is demonstrably incorrect", *id.* at 331–32, 84 S.Ct. at 1297–98, the actual decision was the unsurprising one—although it did surprise two Justices—that

the Amendment did not empower New York to prohibit the sale at John F. Kennedy International Airport of tax-free liquor for "ultimate delivery and use ... in a foreign country", *id.* at 333, 84 S.Ct. at 1299. Justice Stewart's remarks in *Idlewild* must also be read along with his observation, only two terms later, that in a case concerning liquor destined for use, distribution or consumption exclusively in New York—indeed another section of the very statute here at issue—"the Twenty-First Amendment demands wide latitude for regulation by the State." *Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 42, 86 S.Ct. 1254, 1259, 16 L.Ed.2d 336 (1966). However, in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, 445 U.S. 97, 106–10, 100 S.Ct. 937, 943–46, 63 L.Ed.2d 233 (1980), the Court gave further attention to the relation of state powers under the Twenty-First Amendment and the commerce power and, after noting that the Amendment gave the states "virtually complete control over whether to permit importation or sale of liquor and how to structure the liquor distribution system", *id.* at 110, 100 S.Ct. at 946, concluded that:

> Although States retain substantial discretion to establish other liquor regulations, those controls may be subject to the federal commerce power in appropriate situations. The competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a "concrete case". *Hostetter v. Idlewild Liquor Corp.*, 377 U.S., at 332, 84 S.Ct., at 1298.

*Id.* Since this appeal was argued, the Court has again stated that "[i]t is by now clear that the Amendment did not entirely remove state regulation of alcoholic beverages from the ambit of the Commerce Clause," *Bacchus Imports, Ltd. v. Dias*,

---

**3.** While such action by a state would now be immune from antitrust attack under *Parker v. Brown*, there is nothing to indicate that the *Young's Market* Court was peering that far into the future or thought that any such justification was required.

**4.** Both the Twenty-first Amendment and the Commerce Clause are parts of the same Constitution. Like other provisions of the Constitution, each must be considered in the light of the other, and in the context of the issues and interests at stake in any concrete case.

— U.S. ——, ——–——, 104 S.Ct. 3049, 3058, 82 L.Ed.2d 200 (1984).[5]

■ Still this is not at all to say, as plaintiffs assume, that attacks on state reg- ulation of the liquor business as conflicting with the antitrust laws are to be decided as if § 2 of the Twenty-First Amendment did not exist. In *Bacchus Imports,* the Court referred to the language in *Midcal* that a "pragmatic effort [must be made] to harmonize state and federal powers," 445 U.S. at 109, 100 S.Ct. at 945, and also to the statement in *Capital Cities Cable, Inc. v. Crisp,* — U.S. ——, ——, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984), that "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, notwithstanding that its requirements directly conflict with express federal policies." We hold that the challenged sections of New York's Alcoholic Beverage Control Law are not in direct conflict with § 1 of the Sherman Act but that if they were, the interests of New York are entitled to prevail. We leave undecided the question whether Judge Owen was correct in relying, as an alternative ground for decision, on the proposition that New York's activity is protected by the state action doctrine.

## II

Since § 1 of the Sherman Act is directed only to "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies] in restraint of trade or commerce", 15 U.S.C. § 1, plaintiffs have been faced from the outset with the difficulty that the challenged provisions of the Alcoholic Beverage Control Law do not compel any agreement. The schedules required to be filed by the wholesalers are their individual acts. Indeed the complaint does not allege any agreement among the wholesalers; it complains only of the acts of the Authority.

In a case that had been wending its way through the New York courts while this one has been pending in the district court and this court, the New York Court of Appeals considered a few sentences sufficient to dispose upon this ground of a challenge to subdivision 3 of section 101–b apparently identical to that made here. *Admiral Wine & Liquor Co. v. State Liquor Authority,* 61 N.Y.2d 858, 473 N.Y.S.2d 969, 462 N.E.2d 146 (1984), *modifying* 89 A.D.2d 522, 452 N.Y.S.2d 213 (1st Dept. 1982).

Plaintiffs continue to insist, however, as they did unsuccessfully in the district court and in the New York courts, that the case is ruled in their favor by *Midcal, supra.* Analysis of *Midcal* demonstrates that the contention is fallacious.

The California statutory scheme challenged in *Midcal* required that every "wine grower, wholesaler licensed to sell wine, wine rectifier, and rectifier ... [who] own[ed] or control[led] a brand of wine resold to retailers or consumers ... [m]ake and file a fair trade contract *and* a schedule of resale prices ...." *See* Calif.Bus. & Prof.Code § 24866(b) (emphasis supplied). Another section of the code imposed similar obligations on all wine brand owners who were based outside the state. *See* Calif. Bus. & Prof.Code § 24867. Price posting was required only in those rare instances where there was no fair trade contract, *see* Calif.Bus. & Prof.Code § 24866(a), and, as will be seen, such posting was altogether different in its nature and effect from that required by New York. Finally, it was made unlawful for any licensee to purchase, sell or resell any wine at a price other than the one established by either the governing fair trade contract or by a posted price schedule. *See* Calif.Bus. & Prof. Code § 24862. In short, California had created a resale price maintenance system for wine.[6]

5. Three Justices believed that the decision, with the facts of which we need not here concern ourselves, was inconsistent with § 2 of the Twenty-First Amendment. *Bacchus Imports,* — U.S. at ——, 104 S.Ct. at 3059 (Stevens, J., dissenting).

6. When originally enacted, California's "fair trade" system was protected from Sherman Act preemption by the Miller-Tydings Resale Price Maintenance Act of 1937, 50 Stat. 693, which exempted from federal anti-trust laws state statutes sanctioning resale price maintenance. The

In *Midcal Aluminum, Inc. v. Rice*, 90 Cal.App.3d 979, 153 Cal.Rptr. 757 (1979), the petitioner, a licensed wholesaler, which had been accused of selling wine at prices below those contained in a price schedule and of selling wine which was not covered by a "fair trade" contract, sought a determination that the California statute was unconstitutional. The California Court of Appeal for the Third Appellate District held that the statute violated the Sherman Act. The court also found that the California law was not protected by either "state action" immunity or § 2 of the Twenty-First Amendment. The court considered that these holdings were required by the decision of the Supreme Court of California in *Rice v. Alcoholic Beverage Control Appeals Board*, 21 Cal.3d 431, 146 Cal.Rptr. 585, 579 P.2d 476 (1978), where that court struck down similar restrictions on the sale of distilled liquors, there being nothing to show that the provisions with respect to wine had been enacted out of special solicitude for the California wine industry. When the respondent Director of Alcoholic Beverage Control argued that if the fair trade contract provision of the statute were to be held invalid, the wholesale price posting provision "should be severed from the invalid portions of the statutes," *Midcal*, 153 Cal.Rptr. at 761, the Court of Appeal declined to do this. It pointed out that the price posting provision was an incident of a legislative scheme to fix prices; that price posting was required only when there was no fair trade contract in effect; that price posting was intended to have the same effect as a fair trade contract, namely, to fix the price at which sales might be made by retailers; and that the Department had ruled that only one distributor could file a price schedule for any trading area and that this would bind all other distributors—indeed one of the charges against Midcal was that it sold wine for less than the prices contained in a schedule filed by a competing wholesaler. Hence the California court concluded that the price posting

provision was an integral part of the price fixing scheme and was not severable.

The California Retail Liquor Dealers Association intervened as a defendant when the Alcoholic Beverage Control Department refused to appeal. The California Supreme Court declined to hear the case, doubtless because it regarded the decision of the Court of Appeal as following inevitably from its own previous decision in *Rice*, and the Dealers Association sought and obtained certiorari from the Supreme Court of the United States.

The Supreme Court was obliged to take the case as it found it. The California Court of Appeal had construed both parts of the statute, the fair trade contract provision and the alternative price posting provision, which was ruled to be nonseverable therefrom, to be part of a plan whereby all persons at various levels in the chain of distribution were forced to establish identical prices fixed by the brand owner for each brand of wine. Justice Powell was thus able to decide quite summarily that the scheme compelled by the California statute violated § 1 of the Sherman Act. He said that "[t]he wine producer holds the power to prevent price competition by dictating the prices charged by wholesalers", and quoted Justice Hughes' remark in *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 408, 31 S.Ct. 376, 384, 55 L.Ed. 502 (1911), that such vertical control destroys horizontal competition as effectively as if wholesalers "formed a combination and endeavored to establish the same restrictions ... by agreement with each other", and then passed on to the more difficult issues in the case, namely, whether the state's involvement was sufficient to establish antitrust immunity under *Parker v. Brown, supra,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315, and whether the California statute was within the protection of the Twenty-First Amendment, which we shall discuss below.

Miller-Tydings Act was repealed by the Consumer Goods Pricing Act of 1975. *See* 89 Stat. 801

(1975).

The challenged sections of the ABC Law plainly are not a resale price maintenance scheme of the sort condemned in *Midcal.* In contrast to *Midcal,* each wholesaler is completely free to file whatever price schedules he desires, and his schedule now has no controlling effect on retail prices since § 101–bbb, which prohibited retail sales at a price less than that established in a retail price schedule, has been declared to be unconstitutional by the New York Court of Appeals. *See Mezzetti Associates, Inc. v. State Liquor Authority,* 51 N.Y.2d 761, 432 N.Y.S.2d 372, 411 N.E.2d 791 (1980). *Midcal* simply did not deal with a statute like New York's which merely requires wholesalers to post and adhere to their own unilaterally determined prices and nothing more.

However, the inappositeness of *Midcal* is not the end of the matter. It can be argued that § 101–b is nevertheless inconsistent with § 1 of the Sherman Act since it forces each wholesaler to inform other wholesaler of its prices and then to adhere for a month to them (or a lowered price meeting that of a competitor filed within three days), unless prior written permission of the SLA is obtained,[7] and that if this had been done pursuant to an agreement, the agreement would have constituted a violation of § 1 under such cases as *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921); *Sugar Institute v. United States,* 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936), and *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969).[8]

An identical argument was rejected by Judge Blumenfeld in *United States Brew-*

*ers Ass'n, Inc. v. Healy,* 532 F.Supp. 1312, 1329–30 (D.Conn.), *rev'd on other grounds,* 692 F.2d 275 (2 Cir.1982), *aff'd,* —— U.S. ——, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983), on a challenge to a Connecticut posting statute similar to New York's except for the absence of the three day provision. He correctly distinguished *Midcal* as involving an implicit agreement for resale price maintenance and cited *Serlin Wine & Spirits Merchants, Inc. v. Healy,* 512 F.Supp. 936, 938 (D.Conn.1981), *aff'd sub nom. Morgan v. Division of Liquor Control,* 664 F.2d 353, 355 (2 Cir.1981).[9] He then applied our holding in *Modern Home Inst. v. Hartford Accident & Indemnity Co.,* 513 F.2d 102, 108–09 (2 Cir.1975), that § 1 of the Sherman Act "is directed only at joint action" and "does not prohibit independent business actions and decisions," and ruled that the Connecticut statute did not violate § 1 simply because it compelled individual actions which, if taken pursuant to an agreement, might have constituted a violation. *Brewers Ass'n,* 532 F.Supp. at 1330. This holding was adopted in *Enrico's Inc. v. Rice,* 551 F.Supp. 511 (N.D.Calif.1982), *vacated as moot,* 730 F.2d 1250 (9 Cir.1984), in rejecting an attack on a California administrative rule similar to the New York statute, which granted wholesalers the opportunity to match lower posted prices. The judge refused to follow a decision by the California Court of Appeal for the First District, in *Lewis-Westco & Co. v. Alcoholic Beverage Control Appeals Board,* 136 Cal.App.3d 829, 186 Cal.Rptr. 552, 557 (1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), which held, on a record showing price posting to have had an anticompetitive effect,[10] that the posting

---

**7.** The record contains no information as to what use has been made of this provision.

**8.** A partial answer might be that, except for action taken under the three day provision, no wholesaler, when he establishes his own prices, knows what the other wholesalers' prices will be, although he knows what their previous prices were.

**9.** The district court decision in *Serlin* rested both on the lack of any element of agreement and on *Parker v. Brown.* Although this court

affirmed "essentially on the grounds stated in Judge Daly's well-reasoned opinion" and noted that "the Connecticut statutes do not authorize or compel private parties to enter contracts or combinations to fix prices in violation of § 1 of the Sherman Act," our discussion focused on the availability of *Parker v. Brown* immunity. *Morgan,* 664 F.2d at 355, 356.

**10.** The court summarized the evidence in a footnote:

requirement "suffer[ed] from the same infirmity as the wholesale price posting requirements examined in *Midcal*." Finally, *Miller v. Hedlund*, 579 F.Supp. 116 (D.Or. 1984), held that Oregon price posting and adherence provisions substantially similar to New York's, except for the absence of the three day meeting price provision, did not violate § 1 of the Sherman Act because they did not "require inter-wholesaler agreement or concerted action," *id.* at 121, but that regulations requiring wholesale prices to be constant without regard to transportation conditions and forbidding quantity discounts would be preempted but were saved by *Parker v. Brown*.

We must confess to some doubt how the difference of opinion between the federal district courts and the New York Court of Appeals, on the one hand, and the California Court of Appeal, on the other, with respect to the "agreement" issue should be resolved. The position of the former is appealing. Section 1 requires an agreement, state compulsion of individual action is the very antithesis of an agreement, and the argument that an agreement could have been inferred if the wholesalers had voluntarily done what they have been compelled to do is simply too "iffy". Against this, there is some force in the argument that a statute compelling conduct which, in its absence, would permit the inference of

an agreement unlawful under § 1 is inconsistent with that section unless saved by *Parker v. Brown*.

We do not need to resolve that difficult question on this appeal in light of *Rice v. Norman Williams Co.*, 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). That case, also originating in California, involved a statute which provided that a licensed importer, through whom alone alcoholic beverages could be brought into California, "shall not purchase or accept delivery of any brand of distilled spirits unless he is designated as an authorized importer of such brand by the brand owner or his authorized agent." Calif.Bus. & Prof.Code § 23672 (Supp.1984). The California Court of Appeal for the Third District held that the statute was *per se* illegal under the Sherman Act and thus was invalid on its face. This time the Supreme Court reversed.

Justice Rehnquist began his opinion for the Court by laying down the governing standards, 458 U.S. at 659, 102 S.Ct. at 3299:

As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption

---

8. For *inter* brand competition, in 1955, per case prices of the leading gins varied $2.71 per case or approximately 7 percent. In 1975, the difference per case between the highest and lowest leading gin was a single cent. During that same period the case price of bourbons, excluding Ten High, narrowed from $13.47 (14%) variance to $.47 (1%). The leading scotch whiskeys went from $.50 per case variance equal to $\frac{9}{10}$ percent to $.29 per case variance or $\frac{3}{10}$ percent.

For *intra* brand competition, with one exception, every wholesaler who sold one of the leading brands of gin, scotch whiskey or straight whiskey charged the same per case price as his competitors.

Additionally, during the 15-month period prior to the hearing, there were only two instances where the price of one of the analyzed brands was reduced. In November and December 1979, John Walker Red and Gordon's Gin were reduced in price; during those two months every wholesaler in Northern Cal-

ifornia who handled that brand made the exact same price reduction. The following January, each increased his price to the same amount charged by their competitors.
*Lewis-Westco,* 186 Cal.Rptr. at 557 n. 8.

The only evidence approaching this in the present record is a portion of Battipaglia's affidavit in support of plaintiffs' motion for summary judgment which states that for five of the largest selling brands of wine, which were distributed by six or more wholesalers, there were several months in which there was wholesale price uniformity and other months in which there were price disparities, ranging in the case of one wine from 10% to 13%. Peerless endeavors to explain the uniformity on the basis that each wholesaler pays the same price to the supplier, that most of the wholesalers are parties to the same collective bargaining agreement, and that the costs of goods, wages and fringe benefits amount to 95% of a wholesaler's total costs. Peerless argues further that there is vigorous inter-brand competition among wines.

of the state statute. A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws. A state statute is not pre-empted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.

He then characterized *Midcal* as involving a statute that required members of the California wine industry "to file fair trade contracts or price schedules with the State, and provided that if a wine producer had not set prices through a fair trade contract, wholesalers *must* post a resale price schedule for that producer's brands." *Id.* (emphasis in original). The *Midcal* Court had held that "the statute facially conflicted with the Sherman Act because it *mandated* resale price maintenance, an activity that has long been regarded as a *per se* violation of the Sherman Act." *Id.* at 659–60, 102 S.Ct. at 3299 (emphasis in original). After referring to *Joseph E. Seagram & Sons, Inc. v. Hostetter, supra,* 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336, he elaborated as follows, 458 U.S. at 661, 102 S.Ct. at 3300:

Our decisions in this area instruct us, therefore, that a state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute. Such condemnation will follow under § 1 of the Sherman Act when the conduct contemplated by the statute is in all cases a per se violation. If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.

Addressing the statute there challenged, he referred to the holding in *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), that a manufacturer's use of vertical nonprice restraints was not *per se* illegal but rather should be scrutinized under the rule of reason since "restraints on intrabrand competition may promote interbrand competition." *Norman Williams, supra,* 458 U.S. at 661, 102 S.Ct. at 3300. He regarded the California statute as merely enforcing "the distiller's decision to restrain intrabrand competition", leaving him free to designate as few or as many licensed importers as he pleased. *Id.* The statute thus was not facially invalid, although "[t]he manner in which a distiller utilizes the designation statute and the arrangements a distiller makes with its wholesalers will be subject to Sherman Act analysis under the rule of reason", *id.* at 662, 102 S.Ct. at 3301 (footnote omitted). Justice Rehnquist noted, 458 U.S. at 662–63 n. 9, 102 S.Ct. at 3300–01 n. 9, that because of the Court's resolution of the preemption issue, it was not necessary "to consider whether the statute may be saved from invalidation under the doctrine of *Parker v. Brown,* 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315] (1943), or under the Twenty-first Amendment."

Application of the *Norman Williams* standard calls for affirmance here even if we were to accept *arguendo* the contention that an exchange of price information and price adherence compelled by a state are to be treated, for the purpose of antitrust preemption analysis, as if they were voluntary. The Supreme Court has never held that the exchange of price information, in the language of *Norman Williams,* "necessarily constitutes a violation of the antitrust laws in all cases." Until *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), "[a] program to exchange price information was illegal only if, in addition to the agreement to exchange information, the defendants

agreed to fix prices." Note, *Antitrust Liability for an Exchange of Price Information—What Happened to* Container Corporation, 63 Va.L.Rev. 639, 649 (1977) (footnote omitted). Whether or not there was such an agreement would depend on the nature of the information exchanged— broadly speaking, whether it was of the sort in *American Column & Lumber Co. v. United States, supra,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 or of that in *Maple Flooring Manufacturers Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925)—and on the presence of "conscious parallelism", i.e., identical or nearly identical pricing accompanied by "plus factors". See, *e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). But see, *e.g., Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954); *Levitch v. Columbia Broadcasting System, Inc.,* 495 F.Supp. 649, 674–75 (S.D.N.Y.1980), *aff'd* 697 F.2d 495 (2 Cir.1983). Although *Container Corp., supra,* 393 U.S. at 334, 89 S.Ct. at 511, upheld the sufficiency of a complaint charging "an exchange of price information but no agreement to adhere to a price schedule as in *Sugar Institute v. United States,* 297 U.S. 553 [56 S.Ct. 629, 80 L.Ed. 859], or *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150 [60 S.Ct. 811, 84 L.Ed. 1129]", the decision was fact bound, the Court observing, *e.g.,* that the industry was "dominated by relatively few sellers", that "[t]he product is fungible and the competition for sales is price", and that "[t]he demand is inelastic, as buyers place orders only for immediate, short term needs." Justice Fortas, concurring, made clear his understanding that the Court's opinion did not "hold that the exchange of specific information among sellers as to prices charged to individual customers, pursuant to mutual arrangement, is a *per se* violation of the Sherman Act," 393 U.S. at 338–39, 89 S.Ct. at 513, and the Court has subsequently cited the Fortas opinion as support for saying that "the dissemination of price information is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 113, 95 S.Ct. 2099, 2115, 45 L.Ed.2d 41 (1975). Section 101–b thus does not mandate or authorize conduct "that necessarily constitutes a violation of the antitrust laws in all cases." New York wholesalers can fulfill all of their obligations under the statute without either conspiring to fix prices or engaging in "conscious parallel" pricing. So, even more clearly, the New York law does not place "irresistible pressure on a private party to violate the antitrust laws in order to comply" with it. It requires only that, having announced a price independently chosen by him, the wholesaler should stay with it for a month.

In placing our decision upon *Norman Williams* and declining to decide between the two lines of authority with respect to the issue of agreement, we are, of course, acting on the premise that this case is a facial attack on the statute and are leaving open the possibility of a challenge based upon its actual operation. We entertain no doubt that despite the factual material summarized in note 10 *supra,* itself scanty and inconclusive, the attack here was on the ground of facial unconstitutionality. The complaint was addressed to the face of the statute and claimed, erroneously as we have shown, that § 101–b was similar to the California statute invalidated in *Midcal.* Plaintiffs themselves moved for summary judgment, asserting that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law. When the judge ruled against them and the defendants moved for summary judgment on the basis of the judge's opinion, plaintiffs did not controvert their own assertions that there were no genuine factual issues. Indeed they made no claim of the existence of such issues on this appeal. We hold, on the authority of *Norman Williams,* that they failed to make out a case of facial invalidity.

### III

The district judge held that if he had been wrong in concluding that § 101–b is not preempted by § 1 of the Sherman Act, the statute was nevertheless shielded from the antitrust laws by *Parker v. Brown, supra,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Although our conclusion that he was right in his holding in regard to preemption makes it unnecessary to go further so far as this court is concerned, we think it desirable to discuss the application of *Parker v. Brown* and also the balancing of federal and state interests required by the Twenty-First Amendment if § 101–b was preempted and not saved by the state action exception.

*Midcal* established that in order for state activity in the control of the sale of alcoholic beverages to enjoy the benefit of immunity for state regulation of private conduct, two tests must be met: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the state itself." *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (opinion of Brennan, J.).

There can be no fair question that § 101–b meets the first test, as demonstrated by the first subparagraph of the statute which we have quoted in note 2 *supra,* and the preamble quoted in part IV of this opinion. There is grave question, however, whether the second test is satisfied. *Midcal* held that it was not on the facts there presented, since California, having "authorize[d] price-setting and enforce[d] the prices established by private parties", neither established prices nor reviewed the reasonableness of the price schedules nor regulated the terms of the fair trade contracts, 445 U.S. at 105–06, 100 S.Ct. at 943.

It can be argued with some force that the case with respect to § 101–b is distinguishable. California sought to achieve a system of minimum resale prices, a goal clearly forbidden by the antitrust laws. Under such a system, the prevailing price level should have been of primary importance to the state. It was thus appropriate to require active state involvement in price setting as a condition to immunity. New York, in contrast, has sought only to produce orderly market conditions, specifically by preventing price discrimination. Under such a program there is nothing that the state can "actively supervise" except to see that the statutory requirements are obeyed—and there is no claim that the state has neglected this.

However, the most influential treatise on the subject, Areeda & Turner, 1 Antitrust Law ¶ 213d, at 75 (1978), comes to a contrary conclusion. Posing a hypothetical quite similar to the instant case and assuming that unless exempt the practices would violate the antitrust laws, the authors would deny immunity since "[a]lthough the state legislature has decided that these practices would be desirable, it has created a continuing, unsupervised private power to act anticompetitively." [11] In *Miller v. Oregon Liquor Control Comm'n,* 688 F.2d 1222, 1225 (9 Cir.1982), the court, quoting from the Areeda & Turner treatise, refused to apply *Parker v. Brown* so as to uphold self-executing State Liquor Commission regulations requiring wholesalers of beer and wine to post prices ten days prior to their effective dates and, in the case of price decreases, to maintain them for 180 days for malt beverages and 30 days for wine. Our own decision in *Morgan v. Division of Liquor Control, supra,* 664 F.2d 353, which held *Parker v. Brown* to be applicable, rested on the ground that Connecticut had there engaged in active supervision by requiring that a wholesaler's posted prices must not be less than his statutorily defined costs.[12] We must con-

---

11. Query whether the necessary supervision would be furnished if the SLA were required to monitor the filings and report any evidence of agreement on prices to the legislature.

12. These included a minimum mark-up of 11% on spirits and cordials, 20% on wine bottled outside Connecticut and beer, and 36% on wine

fess that there seems to us to be some anomaly in according immunity where a state's program is highly offensive to the antitrust laws, as was true in *Parker v. Brown* itself, provided only that the state involves itself to a certain degree in the iniquity, but in refusing to do so when the state's objective is less at variance with the antitrust laws and is accomplished by a method which requires nothing but policing. Since reliance on *Parker v. Brown* is unnecessary in this case, we think it best to say that we neither approve nor disapprove the alternative holding of the district court and leave the issue for another day.

### IV

On the other hand, if we are wrong in thinking that § 101–b is not in conflict with the antitrust laws in the sense required by *Norman Williams* for a declaration of facial invalidity, here, in contrast to *Midcal*, the state's interest should prevail under the balancing process there prescribed for cases where the procompetition policy of the federal antitrust laws comes in conflict with a state's exercise of the authority reserved to it by § 2 of the Twenty-First Amendment.

We begin by observing that the California statute's confrontation with federal policy in *Midcal* was as sharp as could be imagined. Contracts for resale price maintenance had long been held to be *per se* violations of § 1 of the Sherman Act. *See, e.g., Dr. Miles Medical Co. v. John D. Park & Sons, supra,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502; *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968). Although states had been permitted to sanction these by the Miller-Tydings Act of 1937, see note 6 *supra,* in order to "protect small retail establishments that Congress thought might otherwise be driven from the market place by large-volume discounters", *Midcal, supra,* 445 U.S. at 102, 100 S.Ct. at 941–42. Congress rescinded that permission by the Consumer Goods Pricing Act of 1975. California was thus attempting to continue, with respect to al-

coholic beverages, exactly what Congress had condemned.

As against this strong federal interest, the Court found that California's interest was extremely weak. This finding was made rather easy by the attitude taken by California itself. Justice Powell remarked that, "As the unusual posture of this case reflects, the State of California has shown less than an enthusiastic interest in its wine pricing system," 445 U.S. at 111 n. 12, 100 S.Ct. at 946 n. 12, adding that "the state agency responsible for administering the program did not appeal the decision of the California Court of Appeal" which struck down the law. *Id.* Beyond this the Supreme Court of California in the *Rice* case, *supra,* 579 P.2d 476 (dealing with distilled liquors), which the Court of Appeal for the Third District found decisive in *Midcal,* 153 Cal.Rptr. 757, 760 (dealing with wine), had engaged in the balancing process and found the state's interest in resale price maintenance to be small. After saying that the Supreme Court accords "respectful consideration and great weight to the views of the state's highest court" on such a matter, quoting *Indiana ex rel. Anderson v. Brand,* 303 U.S. 95, 100, 58 S.Ct. 443, 446, 82 L.Ed. 685 (1938), Justice Powell went on to summarize the findings of the California Supreme Court in *Rice.* That court had identified two purposes behind the California legislature's decision to prescribe resale price maintenance: "to promote temperance and orderly market conditions", the latter being primarily aimed at "protect[ing] small licensees from predatory pricing policies of large retailers." *Midcal,* 445 U.S. at 112, 100 S.Ct. at 947 (quoting *Rice v. Alcoholic Beverage Control Appeals Board,* 579 P.2d at 490, 493). The state Supreme Court cited a study made by a state agency which showed that per capita liquor consumption in California had risen by 42% while resale price maintenance was in effect and a congressional study showing that states with fair trade acts had a higher rate of firm failures and a lesser rate of growth in

bottled within Connecticut. Conn.Gen.Stat. §§ 30–68, 30–68e, 30–68j (1975).

small retail stores than free trade states. The state Supreme Court thus found no persuasive justification to continue "fair trade laws which eliminate price competition among retailers", 579 P.2d at 494, and the Court of Appeal came to the same conclusion with respect to the wine trade. With the state courts thus having in effect given up the ghost, the state liquor agency making no attempt to defend the statute it was administering and only the state attorney general as *amicus* having a good word to say for the law, the Court had an easy time in concluding that nothing in the record suggested that the wine pricing system helped sustain small retail establishments or inhibited the consumption of alcohol by Californians, and that "[t]he unsubstantiated state concerns put forward in [the] caser simply [were] not of the same stature as the goals of the Sherman Act." [13]

 The situation here is quite different. As shown in Part II of this opinion, there is no such direct conflict between the antitrust laws and the state enactment as there was in *Midcal*. Moreover, the state interest is strong. In the 1964 repeal of the former system of resale price maintenance, the New York Legislature declared:

§ 8. In enacting section eleven of this act [repealing the resale price maintenance law], it is the firm intention of the legislature (a) that fundamental principles of price competition should prevail in the manufacture, sale and distribution of liquor in this state, (b) that consumers of alcoholic beverages in this state should not be discriminated against or disadvantaged by paying unjustifiably higher prices for brands of liquor than are paid by consumers in other states, and that price discrimination and favoritism are contrary to the best interests and welfare of the people of this state, and (c) that enactment of section eleven of this act will provide a basis for eliminating such discrimination against and disadvan-

tage of consumers in this state. In order to forestall possible monopolistic and anti-competitive practices designed to frustrate the elimination of such discrimination and disadvantage, it is hereby further declared that the sale of liquor should be subjected to certain further restrictions, prohibitions and regulations, and the necessity for the enactment of the provisions of section nine of this act [requiring that liquor price affirmations be filed] is, therefore, declared as a matter of legislative determination.

Act of April 16, 1964, ch. 531, 1964 N.Y. Laws 2545, 2551. Promotion of temperance is not the only interest reserved to the states by § 2 of the Twenty-First Amendment. The Legislature thus at least thought it was promoting price competition. Furthermore it expressly found that "price discrimination and favoritism are contrary to the best interests and welfare of the people of this state"—a policy which is reflected in the federal antitrust laws, 15 U.S.C. § 13. There can be no doubt that requiring wholesalers to post their prices and to observe them for a month is an effective way, perhaps the only really effective way, of enabling the SLA to prevent price discrimination. The provision in § 101–b(4) allowing a wholesaler, within three days after disclosure of the price schedules, to meet any lower price, while not strictly necessary to enforcement of the policy against discrimination, was a reasonable effort by the legislature to prevent the one month adherence provision from severely damaging the competitive position of a wholesaler who had posted prices even slightly above the lowest ones. Although it can be argued that this operates as a disincentive to reducing prices in the original filings, plaintiffs have not alleged this in their complaint, produced evidence that it has occurred, or shown that it has had deleterious effects. Since most brands are sold to all wholesalers at nearly the same price, as the Robinson-Patman Act generally requires, there is not much

---

13. The Court reserved the question "whether the legitimate state interests in temperance and the protection of small retailers ever could prevail against the undoubted federal interest in a competitive economy." 445 U.S. at 113–14, 100 S.Ct. at 947.

possibility of price competition at the wholesale level, see note 10 *supra.* On the other hand, as was conceded at argument, the ABC Law has not prevented vigorous competition—both intrabrand and interbrand—among wine retailers. Here also, in contrast to *Midcal,* those charged with administering the statute and the highest court of New York have identified it as embodying an important state policy. The "weighing" process prescribed by *Midcal* cannot mean that whenever a state statute has some anticompetitive effect, the federal interest prevails; unless there is some anticompetitive effect, there is no occasion to weigh. At least upon a record such as this, § 2 of the Twenty-First Amendment dictates deference to the state.

Affirmed.

WINTER, Circuit Judge, dissenting:

I respectfully dissent. I disagree with the majority's conclusion that the arrangements mandated by the New York legislation in question would not be *per se* violations of Section 1 of the Sherman Act if solely the result of an agreement among private firms. I therefore also take a different view of the application of *California Retail Liquor Dealers Assn. v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) and of the twenty-first amendment to this case.

It is true that arrangements that merely call for the exchange of price information are subject to rule of reason, rather than *per se,* analysis. *United States v. Container Corp.,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *Maple Flooring Manufacturers Assn. v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); *American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921). However, the challenged legislation not only mandates the exchange of price information but also requires adherence to publicly announced prices until thirty days after notice is given of a new price. A requirement of adherence to announced prices has been uniformly held illegal without regard to its reasonable-

ness. *Sugar Institute v. United States,* 297 U.S. 553, 601, 56 S.Ct. 629, 643, 80 L.Ed. 859 (1936) ("steps ... to secure adherence, without deviation, to prices and terms ... announced" are illegal). The Supreme Court emphasized as recently as 1980 the "plain distinction between the lawful right to publish prices ... on the one hand, and an agreement among competitors limiting action with respect to the published prices, on the other." *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 649–50, 100 S.Ct. 1925, 1929, 64 L.Ed.2d 580 (1980) (per curiam). *See also United States v. Trans-Missouri Freight Association,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897). The arrangement in question thus would be *per se* illegal if accomplished solely through private agreement, and our decision, therefore, is governed by *Midcal* rather than by *Rice v. Norman Williams Co.,* 458 U.S. 654, 102 S.Ct. 3294, 73 L.Ed.2d 1042 (1982). Indeed, to hold otherwise is to forbid states from authorizing resale price maintenance, the anticompetitive effect of which is the subject of great controversy, *see* R. Bork, *The Antitrust Paradox* 288–91 (1978), but to allow them to authorize horizontal price fixing, about which all agree.

I also do not share the majority's concern that the arrangement here is compelled by law rather than achieved through private arrangement. The relevant issue under the supremacy clause has to do with the degree to which a state may bring about the very anti-competitive arrangements the Sherman Act was designed to avoid. Whether a state merely authorizes private parties to fix prices or compels them to do so may of course be relevant to the first part of the two-part *Midcal* test, namely whether the challenged restraint is "clearly articulated and affirmatively expressed as state policy." 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978)). Nevertheless, the fact that the state compels a private cartel offers no reason to exempt the legislation from scrutiny under the supremacy clause.

I also conclude that the legislation in question fails the *Midcal* test. Although the policy of creating the cartel in question is surely "one clearly articulated and affirmatively expressed" by the state, the legislation fails to meet the second part of the *Midcal* test, namely that "the policy must be 'actively supervised' by the State itself." 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette v. Louisiana Power and Light Co.*, 435 U.S. at 410, 98 S.Ct. at 1135). As was the case with the California legislation at issue in *Midcal*, New York does nothing whatsoever to establish the actual prices charged, review their reasonableness, monitor market conditions, or engage in reexamination of the program. As in *Midcal*, "[t]he national policy in favor of competition [is] thwarted by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." 445 U.S. at 106, 100 S.Ct. at 943.

Our decision in *Morgan v. Division of Liquor Control*, 664 F.2d 353 (2d Cir.1981) is not to the contrary. In that case, we held that Connecticut legislation met the second part of the *Midcal* test because it set a floor for prices established by an express statutory formula and allowed free competition above that floor. In the present case, the only "monitoring" of the state program lies in the provision that responsive price changes cannot be lower than those announced by competitors. That provision, which heightens rather than monitors the anti-competitive impact of the legislation, hardly satisfies the second part of the *Midcal* test.

While I quite agree with Judge Friendly's observations that we should not treat the twenty-first amendment as though it had no application at all to the present case, I do not perceive it to be of any great importance given my view of the New York legislation. Although the statute expresses a concern over the perils of cheap (competitively priced) liquor, the notion that this legislation was even remotely the result of political pressure exerted by aroused temperance groups is a quaint fiction. The self-evident purpose of the statute is to create a cartel of liquor wholesalers for their benefit. Although I believe that the twenty-first amendment allows a state to limit consumption of alcohol by causing its price to be high, I also believe that in such an instance a state must do something more than authorize a cartel of dealers to seek out their profit maximizing price/output level. The issue need not be elaborated in dissent beyond stating my view that where state legislation merely legislates a cartel of liquor dealers and plays no further role in determining prices and output, its self-evident purpose is not to protect the public from the evils of the demon rum, but to preserve the high standard of living of those who sell it. Since the twenty-first amendment was plainly designed only to allow the states to legislate against the evils of intoxicating liquors rather than to reward its purveyors, I see no room for its application in the present case.

I therefore dissent.